**Joel A. GERBER, Plaintiff Below, Appellant,**

v.

**ENTERPRISE PRODUCTS HOLDINGS, LLC; Enterprise Products Partners, L.P.; Randa Duncan Williams; O.S. ("Dub") Andras; Charles E. McMahen; Edwin E. Smith; Thurmon M. Andress; Richard H. Bachmann; B.W. Waycaster; Ralph S. Cunningham; W. Randall Fowler; and Randa Duncan Williams, Richard H. Bachmann, and Ralph S. Cunningham, in their Capacity as Executors of the Estate of Dan L. Duncan, Deceased, Defendants Below, Appellees.**

No. 46, 2012.

Supreme Court of Delaware.

Submitted: Feb. 8, 2013.

Decided: June 10, 2013.

---

402

Jessica Zeldin, Esquire, Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware; Of Counsel: Jeffrey H. Squire (argued) and Lawrence P. Eagel, Esquires, Bragar Wexler Eagel & Squire, P.C., New York, NY; Daniel L. Carroll, Esquire, Ingram Yuzek Gainen Carroll & Bertolotti, LLP, New York, NY; for Appellant.

Gregory P. Williams (argued), Catherine G. Dearlove, and Blake Rohrbacher, Esquires, Richards, Layton & Finger, P.A., Wilmington, Delaware; for Appellees Thurmon M. Andress, Charles E. McMahen, Edwin E. Smith and B.W. Waycaster.

Rolin P. Bissell and Tammy L. Mercer, Esquires, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; Of Counsel: Karl S. Stern, Esquire, Vinson & Elkins, L.L.P., Houston, Texas; for Appellees Enterprise Products Holdings, LLC, Oscar S. Andras, Ralph S. Cunningham, W. Randall Fowler and Richard H. Bachmann.

A. Gilchrist Sparks, III, Thomas W. Briggs, Jr., and D. McKinley Measley, Esquires, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware; for Appellees Enterprise Products Partners L.P.

Richard D. Heins, Richard L. Renck, and Stacy L. Newman, Esquires, Ashby & Geddes, Wilmington, Delaware; for Appellees Enterprise Products Company, Randa Duncan Williams, in her individual capacity, and Randa Duncan Williams, Richard H. Bachmann and Ralph S. Cunningham in their capacities, as Executors of the Estate of Dan L. Duncan, deceased.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

JACOBS, Justice:

## I. INTRODUCTION

The plaintiff, Joel A. Gerber, held limited partnership units ("LP units") of Enterprise GP Holdings, L.P., a Delaware limited partnership ("EPE"). Gerber brought this action in the Court of Chancery on behalf of two classes of former public holders of LP units of EPE. On behalf of the first class ("Class I"), Gerber challenged the sale by EPE in 2009 of Texas Eastern Products Pipeline Company, LLC ("Teppco GP") to Enterprise Products Partners, L.P. ("Enterprise Products LP") (the "2009 Sale"). On behalf of the second class ("Class II"), Gerber challenged the triangular merger in 2010 of EPE into a wholly-owned subsidiary of Enterprise Products LP (the "2010 Merger").[1]

Gerber's complaint asserted claims against Enterprise Products Holdings, LLC ("Enterprise Products GP" or "general partner")—EPE's general partner before the 2010 Merger. Other named defendants were Enterprise Products LP; certain members of Enterprise Products GP's Board of Directors (the "Director Defendants"); the Estate of Dan L. Duncan ("Duncan"), who before his death controlled EPE, Enterprise Products LP, and Enterprise Products GP ("Duncan's Estate");[2] and Enterprise Products Compa-ny ("EPCO"), an affiliate of Enterprise Products LP.[3]

The Defendants moved to dismiss the Complaint in its entirety.[4] On January 6, 2012, the Court of Chancery issued an opinion and order granting the motion to dismiss,[5] from which Gerber has appealed to this Court. For the reasons set forth in this Opinion, we affirm in part, reverse in part, and remand.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY [6]

### A. The Parties

EPE was a Delaware limited partnership engaged in the oil and gas business. Plaintiff Gerber owned EPE LP units continuously from October 24, 2006 until the 2010 Merger in which his EPE LP units were converted into units of Enterprise Products LP.

Enterprise Products LP is a Delaware limited partnership engaged in the oil and gas business. Before the 2010 Merger, EPE and Enterprise Products LP were part of a two-tier limited partnership structure. EPE was the 100% owner of Enterprise Products LP's general partner (Enterprise Products GP). Because EPE had no independent operations, the assets of Enterprise Products LP generated cash flows to both Enterprise Products LP and EPE.

---

1. Class I includes all public holders of EPE LP units who continuously held their units from the date of the 2009 Sale through the date of the 2010 Merger. Class II includes all public holders of EPE LP units on the effective date of the 2010 Merger.

2. Mr. Duncan died on March 28, 2010, after the 2009 Sale but before the 2010 Merger.

3. We refer to the Director Defendants, Enterprise Products LP, Enterprise Products GP, EPCO, and Duncan's Estate collectively as the "Defendants" in this Opinion.

4. Alternatively, the Defendants moved to stay the action pending the outcome of a related case, Gerber v. EPE Hldgs., LLC, 2011 WL 4538087 (Del.Ch. Sept. 29, 2011) ("Gerber I").

5. Gerber v. Enterprise Prods. Hldgs., LLC, 2012 WL 34442 (Del.Ch. Jan. 6, 2012) ("Gerber II").

6. The factual background is derived from the Court of Chancery opinion and the amended Complaint. Id.

Enterprise Products GP is a privately-held Delaware limited liability company owned by a Duncan affiliate. Before the 2010 Merger, Enterprise Products GP—then named EPE Holdings, LLC ("EPE GP")—was EPE's general partner. After the 2010 Merger, EPE GP was renamed Enterprise Products GP and became the general partner of Enterprise Products LP.[7]

EPCO is a privately-held Texas corporation whose stock was owned, at the time of the 2009 Sale, by Duncan and members of his family. EPCO's principal business was to provide employees, management, and administrative services to Duncan's companies, including Enterprise Products LP, Enterprise Products GP, and (until the 2010 Merger) EPE.

The Director Defendants—Randa Duncan Williams, O.S. ("Dub") Andras, Charles E. McMahen, Edwin E. Smith, Thurmon Andress, Ralph S. Cunningham, Richard H. Bachmann, B.W. Waycaster, and W. Randall Fowler—were at all relevant times directors of Enterprise Products GP (the "Board").[8] Messrs. McMahen, Smith, and Andress comprised the Board's Audit, Conflict, and Governance Committee (the "ACG Committee") until July 2010. In late July 2010, Mr. Smith recused himself from all ACG Committee activities because of conflicts relating to anticipated merger proposals from Enterprise Products LP. In August 2010, Mr. B.W. Waycaster was appointed to the Board and became the ACG Committee's third member.

The somewhat labyrinthine relationships among these affiliated entities and their controllers before the 2009 Sale are shown in the following chart:

*Chart A: Before 2009:*

## Chart A: Before 2009:

### B. The Facts

7. To avoid potential confusion, references to "Enterprise Products GP" also encompass EPE GP before the 2010 Merger.

8. Directors Williams, Cunningham, and Bachmann are also named as defendants in their capacity as the executors of Duncan's Estate.

### 1. The 2009 Sale

In May 2007, EPE purchased Teppco GP from a Duncan affiliate in exchange for EPE LP units worth $1.1 billion.[9] Teppco GP was the general partner of Teppco Partners, LP, a Delaware oil and gas master limited partnership ("Teppco LP"). In 2009, the Defendants caused EPE to sell Teppco GP to Enterprise Products LP in what became the "2009 Sale." On the same date that the 2009 Sale closed, the Defendants also caused EPE to sell Teppco LP to Enterprise Products LP in a separate but related transaction (the "Teppco LP Sale").

In the 2009 Sale, as consideration for selling Teppco GP to Enterprise Products LP, (i) EPE received $39.95 million worth of Enterprise Products LP's LP units, and (ii) Enterprise Products GP (then owned by EPE) received an approximately $60 million increase in the value of its general partner interest in Enterprise Products LP. The claim challenging the 2009 Sale is essentially that EPE acquired Teppco GP for $1.1 billion in 2007, but two years later was caused by the Defendants to sell Teppco GP to Enterprise Products LP for $100 million—only 9% of EPE's original purchase price.

The 2009 Sale was first presented to the ACG Committee of Enterprise Products GP for its approval. That Committee hired the investment bank, Morgan Stanley & Co. ("Morgan Stanley"), to furnish an opinion on whether the transaction was fair from a financial point of view to EPE and the public holders of its LP units. Morgan Stanley opined that, as of the date of its June 28, 2009 fairness opinion (the "Morgan Stanley 2009 opinion"), "the Con-

sideration to be paid pursuant to the [combined 2009 Sale and Teppco LP Sale] is fair from a financial point of view to EPE and accordingly, to the limited partners of EPE (other than Dan Duncan and his affiliates)." Morgan Stanley cautioned, however, that it expressed "no opinion with respect to … the fairness to EPE or its limited partners of any particular component of the Consideration (as opposed to the Consideration, taken as a whole), in each case in connection with the [two Sales]." The ACG Committee approved the 2009 Sale and recommended its approval by the Board, and on June 28, 2009 the Board approved the 2009 Sale.

We pause to focus on the consideration that Morgan Stanley opined was fair in its 2009 opinion. The 2009 Sale closed on October 26, 2009, when EPE sold Teppco GP to Enterprise Products LP. As noted, that same day, EPE sold Teppco LP to Enterprise Products LP in a separate but related transaction—the "Teppco LP Sale." The 2009 Sale and the Teppco LP Sale were separately negotiated and were the subjects of separate merger agreements.[10] Importantly, in its 2009 opinion, Morgan Stanley opined on the fairness of the total consideration paid for both the 2009 Sale and the Teppco LP Sale. Morgan Stanley did not opine, however, on the fairness of the portion of the total consideration specifically allocable to the 2009 Sale.

As a result of the 2009 Sale, the relationships among the various entities became reconfigured as shown in the chart below:

*Chart B: After the 2009 Sale:*

9. Gerber challenged that 2007 transaction in *Gerber I, supra* note 4. The claims asserted in *Gerber I* in connection with the 2007 transaction are referred to in this Opinion as the "2007 Claims." The claims asserted in this

action in connection with the 2009 Sale are referred to as the "2009 Claims."

10. Each transaction, however, was conditioned on the closing of the other.

## Chart B: After the 2009 Sale:

### 2. The 2010 Merger

In July 2010, Enterprise Products LP and the Board of Enterprise Products GP began discussing a merger between EPE and Enterprise Products LP. Between July 2010 and August 23, 2010, Enterprise Products LP made two offers to the Enterprise Products GP Board, which rejected both as inadequate. On August 23, 2010, Enterprise Products LP made a third offer. On August 25, 2010, the Board's ACG Committee met with its legal advisors and discussed the EPE LP unitholders' legal claims pending in *Gerber I*, as well as the unitholders' potential legal claims that might arise from the 2009 Sale (collectively, the "2007 and 2009 Claims").

After the ACG Committee considered the 2007 and 2009 Claims, the Board made a counteroffer on August 30, 2010. That same day, the ACG Committee of Enterprise Products GP met with its counterpart ACG Committee of Enterprise Products LP. Both ACG Committees exchanged views and information in an effort to arrive at mutually acceptable terms. Later that day, Enterprise Products LP made its final offer: Each LP unit of EPE would be converted into a right to receive 1.5 LP units of Enterprise Products LP.

The Court of Chancery found that a primary purpose of the 2010 Merger was to eliminate the 2007 and 2009 Claims. On September 3, 2010, Morgan Stanley orally opined, and later confirmed in writing, that the 2010 Merger exchange ratio

was fair from a financial point of view to the holders of EPE's LP units (the "Morgan Stanley 2010 opinion"). In assessing the fairness of the merger exchange ratio, however, Morgan Stanley did not independently value the 2007 and 2009 Claims, and EPE never obtained any such valuation. That is, those Claims and their values were not considered in arriving at the 2010 Merger exchange ratio.

On September 7, 2010, EPE and Enterprise Products LP announced that they had agreed upon a merger in which Enterprise Products LP would acquire all of EPE's outstanding LP units. The proxy statement sent to the holders of EPE's LP units did not disclose that the 2007 and 2009 Claims had not been considered or valued for purposes of fixing the 2010 Merger consideration.

Enterprise Products LP and certain privately-held entities controlled by Duncan's Estate (including EPCO) collectively owned a combined 76% majority interest of EPE's LP units. Those entities voted their 76% interest in favor of the 2010 Merger, thereby ensuring its approval. On November 22, 2010, EPE merged into a wholly-owned subsidiary of Enterprise Products LP.

As a result of the 2010 Merger, the configuration of the relationships among the entities was again altered, this time as depicted in the following chart:

*Chart C: After the 2010 Merger:*

## Chart C: After the 2010 Merger:

### C. The Complaint

In his March 2011 amended complaint ("Complaint"), Gerber challenged the 2009 Sale and the 2010 Merger on behalf of the two classes of EPE former public unitholders described above. Gerber's claims are set forth in six Counts.

*Count I* alleges that because the 2009 Sale was neither fair nor reasonable to EPE and its LP unitholders, the Defendants breached their express contractual duties as well as the implied covenant of good faith and fair dealing, under EPE's Limited Partnership Agreement ("LPA").

*Count II* claims that the Defendants breached those duties by causing EPE to enter into the 2010 Merger without according any value to EPE's 2007 and 2009 Claims. *Count III* alleges that Duncan, EPCO, and Enterprise Products LP tortiously interfered with the LPA, and unjustly enriched themselves in the 2009 Sale, by causing EPE to sell Teppco GP to Enterprise Products LP for inadequate consideration. *Count IV* avers that those same defendants (Duncan, EPCO, and Enterprise Products LP) tortiously interfered with the LPA and unjustly enriched themselves in the 2010 Merger, by failing to accord any value to the 2007 and 2009 Claims. *Count V* charges all Defendants (except Enterprise Products GP) with aiding and abetting Enterprise Products GP's breach of express and implied contractual duties, when Enterprise Products GP caused EPE to undertake the 2009 Sale. *Count VI* similarly alleges that all Defendants (except Enterprise Products GP) aided and abetted Enterprise Products GP's breach of those duties, when Enterprise Products GP caused EPE to engage in the 2010 Merger.

In May 2011, the Defendants moved to dismiss the Complaint in its entirety for failure to state a cognizable claim for relief under Court of Chancery Rule 12(b)(6). In an opinion handed down on January 6, 2012, the Court of Chancery granted that motion.[11]

### D. The Court of Chancery Opinion

#### 1. *Relevant Statutory and LPA Provisions*

In conducting its legal analysis, the Court of Chancery relied on certain provisions of the Delaware Revised Uniform Limited Partnership Act ("DRULPA")[12]

and EPE's Limited Partnership Agreement ("LPA"). To facilitate the reader's understanding of that court's analysis and the issues presented on this appeal, those statutory and contractual provisions are briefly summarized at this point.

Section 17–1101(d) of the DRULPA provides that a general partner's duties to a limited partnership or its unitholders, including fiduciary duties, "may be expanded or restricted or eliminated by provision in the [limited] partnership agreement; provided that the [limited] partnership agreement may not eliminate the implied contractual covenant of good faith and fair dealing."[13]

The Vice Chancellor determined that, under DRULPA § 1101(d), the LPA had supplanted the fiduciary duties to which EPE's general partner and EPE's other fiduciaries would otherwise have been subject. Section 7.9(b) of the LPA expressly provided that the conduct of the general partner or any of its "Affiliates" must be in "good faith," defined as a "belie[f] that the determination or other action is in the best interests of the Partnership":

> *Whenever the General Partner makes a determination* or takes or declines to take any other action, *or any of its Affiliates causes it to do so,* ... then unless another express standard is provided for in this Agreement, the General Partner, or such Affiliates causing it to do so, shall make such determination or take or decline to take such other action in *good faith,* and shall not be subject to any other or different standards imposed by this Agreement, any other agreement contemplated hereby or under the Delaware Act or any other law, rule or regulation or at equity. In order

---

11. *Gerber II, supra* note 5, at *14.

12. 6 *Del. C.* § 17–1101 *et seq.*

13. *Id.* § 17–1101(d).

for a determination or other action to be in *"good faith"* for purposes of this Agreement, the Person or Persons making such determination or taking or declining to take such other action must *believe that the determination or other action is in the best interests of the Partnership.*[14]

In addition to changing the liability standard, the LPA also created two separate layers of protection designed to insulate the Defendants from judicial review of whether the general partner or its "Affiliates" had satisfied their contractual duty. The first layer of insulation is Section 7.9(a) of the LPA, which covered "conflict of interest" transactions. That provision created four "safe harbors"[15] within which the general partner and its "Affiliates" could effectuate a conflict of interest transaction free of any claim that they breached "any duty stated or implied by law or equity." Section 7.9(a) relevantly provided:

> Unless otherwise expressly provided in this Agreement, whenever a potential *conflict of interest* exists or arises between the General Partner or any of its Affiliates, on the one hand, and the Partnership or any Partner, on the other hand, *any resolution or course of action by the General Partner or its Affiliates* in respect of such conflict of interest shall be permitted and deemed approved by all Partners, and *shall not constitute a breach of this Agreement* ..., *or of any duty stated or implied by law or equity, if* the resolution or course of action in respect of such conflict of interest is[:]

(i) *approved by Special Approval,*

(ii) approved by the vote of a majority of the Units excluding Units owned by the General Partner and its Affiliates,

(iii) on terms no less favorable to the Partnership than those generally being provided to or available from unrelated third parties or

(iv) fair and reasonable to the Partnership, taking into account the totality of the relationships between the parties involved (including other transactions that may be particularly favorable or advantageous to the Partnership).[16]

The first of those four enumerated safe harbors—"Special Approval" is implicated in this case. That term is defined in the LPA as "approval by a majority of the members of the [ACG] Committee."[17] The layer of insulation afforded by Section 7.9(a) precludes judicial review of any conflict transaction that is the subject of "Special Approval," except for the limited purpose of determining whether the "Special Approval" process itself complied with the implied covenant of good faith and fair dealing ("implied covenant").

The second layer of insulation from judicial review was afforded by Section 7.10(b) of the LPA, which applied more broadly and was not limited to conflict of interest transactions. Section 7.10(b) created a "conclusive presumption" that the general partner acts in "good faith" where the following condition is satisfied:

> The General Partner may consult with ... [experts or] investment bankers ..., and any act taken or omitted to be taken in *reliance* upon the opinion ... of such

---

14. Italics added.

15. *See Norton v. K–Sea Transp. Partners L.P.,* 67 A.3d 354, 364, 2013 WL 2316550, at *7 (Del.2013) (concluding that a similar provision in a limited partnership agreement was a permissive safe harbor).

16. Italics added.

17. Attachment I to the LPA ("Defined Terms").

Persons as to matters that the General Partner reasonably believes to be within such Person's professional or expert competence shall be *conclusively presumed* to have been done or omitted in good faith and in accordance with such opinion.[18]

## 2. The Applicable Standard of Liability

In addressing the legal sufficiency of the Complaint, the Vice Chancellor determined preliminarily that: (1) the 2009 Sale was a "conflict of interest transaction," because both the purchaser and seller had a common controller;[19] (2) "a principal purpose of the [2010] Merger was the termination of [EPE's] 2007 and 2009 Claims;"[20] and (3) absent any contrary LPA provision, Enterprise Products GP (as EPE's general partner), the Director Defendants (as members of the general partner's Board), and Duncan (as the general partner's controller) and EPCO, all owed fiduciary duties to EPE and its LP unitholders.[21] Stated differently, absent contractual modifications, all Defendants would have been subject to default fiduciary duty standards of liability in connection with the two challenged transactions.

The court concluded, however, that the LPA had contractually modified the Defendants' fiduciary duties, by eliminating and supplanting them with an express contractual duty to act in good faith. Additionally, the court concluded, even under that good faith standard, Duncan, EPCO, and the Director Defendants were not sub-

ject to any contractual liability, for two reasons. First, the 2009 Sale and 2010 Merger received "Special Approval" and therefore the transactions were "deemed approved" and did not breach the contractual duty of good faith. Second, those Defendants were not subject to the implied covenant, because they were not parties to the LPA.

Accordingly, the court focused its analysis primarily on the question of whether the Complaint cognizably alleged that Enterprise Products GP—as EPE's general partner and the only Defendant that signed the LPA—breached the LPA's contractual good faith standard or the implied covenant in connection with the two challenged transactions.

## 3. The 2009 Sale

The Vice Chancellor first analyzed the Counts relating to the 2009 Sale and concluded that they stated no legally cognizable claims for relief. The court reasoned as follows: The 2009 Sale had received valid Section 7.9(a) "Special Approval" by the ACG Committee of the Board of Enterprise Products GP, because that Committee's three members all satisfied the independence, qualification, and experience requirements of the United States Securities & Exchange Commission ("SEC") and the rules and regulations of the SEC and the New York Stock Exchange ("NYSE").[22] Because the Committee members were duly qualified under LPA Section 7.9(a), the Committee's approval of the 2009 Sale "[did] not constitute a breach

18. Italics added.

19. *Gerber II, supra* note 5, at *9.

20. *Id.* at *7.

21. *Id.* at *11 n. 46. The court further found that only Enterprise Products GP, as the sole Defendant that signed the LPA, was potentially subject to the implied covenant of good faith and fair dealing. *Id.* at *11. Enterprise Products LP did not, however, owe any com-

mon law contractual or fiduciary duties to EPE or its LP unitholders, because no claim was asserted that Enterprise Products LP (which was not a party to the LPA), exercised any control over EPE in connection with the 2009 Sale.

22. The court held that although the Complaint listed "a host of connections between the ACG Committee members and Duncan, none of [those] connections [was] a disqualify-

of [the LPA] or of any agreement contemplated ... therein, or of any duty stated or implied by law or equity." [23] Therefore, the Complaint failed to state a legally sufficient claim against any Defendant for breach of the contractual fiduciary duty of good faith with respect to the 2009 Sale.

Nor (the court held) did the Complaint state a cognizable claim for breach of the implied covenant. The court acknowledged that although the implied covenant "constrains the Special Approval process," that covenant binds only the parties to the partnership contract.[24] Here, only Enterprise Products GP—but not its "Affiliates" (Duncan, EPCO, and the Director Defendants)[25]—signed the LPA and became subject to the implied covenant.[26] The court did pointedly hold that "[t]he Complaint can fairly be read to allege that Enterprise Products GP acted in bad faith when it chose to use the Special Approval process."[27] Nonetheless, Enterprise Products GP was fully protected from liability by virtue of the "conclusive presumption of good faith" provision of LPA Section 7.10(b).

The reason LPA Section 7.10(b) foreclosed contractual liability (the court ruled) was that the ACG Committee (and by logical inference EPE's general partner) had relied upon the Morgan Stanley 2009 opinion, and the Complaint alleged no basis to infer that the general partner had any reason to doubt Morgan Stanley's competence. The court premised its reasoning upon its apparent understanding that Morgan Stanley's 2009 opinion addressed only the fairness of the 2009 Sale. As the court stated in its opinion, Morgan Stanley opined that "the Consideration to be paid pursuant to the [2009 Sale] is fair from a financial point of view to EPE and accordingly, to the limited partners of EPE (other than Dan Duncan and his affiliates)."[28]

In so characterizing Morgan Stanley's 2009 opinion, the court misquoted—and thus perhaps misread—that opinion. In fact, the "Consideration" that Morgan Stanley opined was fair to EPE was the *total* consideration for the *combined* 2009 Sale and Teppco LP Sale—*not* just the component of the total consideration spe-

---

ing relationship that necessarily prevent[ed] a director from being considered independent under [NYSE Corporate Governance] Rule 303A.02(b)." *Id.* at *10. Because Gerber has not challenged the independence of the Director Defendants on appeal, we assume, without deciding, that that finding is correct. We further assume, for purposes of this appeal, that because the ACG Committee was validly constituted, the 2009 Sale received Special Approval in conformity with the express requirements of LPA Section 7.9(a)(i).

23. *Id.* (quoting LPA § 7.9(a)) (internal quotations omitted).

24. *Id.* at *11.

25. An "Affiliate" is defined in the LPA as:

[W]ith respect to any Person, any other Person that directly or indirectly through one or more intermediaries controls, is controlled by or is under common control with,

the Person in question. As used herein, the term "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise. Notwithstanding the foregoing, a Person shall only be considered an "Affiliate" of the General Partner if such Person owns, directly or indirectly, 50% or more of the voting securities of the General Partner or otherwise possesses the sole power to direct or cause the direction of the management and policies of the General Partner. Attachment I to the LPA ("Defined Terms"). No party disputes that this provision encompasses all of the Defendants.

26. *Gerber II, supra* note 5, at *11.

27. *Id.*

28. *Id.* at *2, *12 (alteration in original).

cifically allocable to the 2009 Sale.[29] Based on that apparent misreading, the court determined that Enterprise Products GP must be "conclusively presumed" to have acted in good faith under LPA Section 7.10(b). Consequently, Enterprise Products GP was "protected from any claims asserting that the action was taken other than in good faith .... includ[ing] good faith claims arising under the duty of loyal[t]y, the implied covenant, and any other doctrine." [30] In particular, "[a]lthough the well-pled facts of the Complaint may suggest that Enterprise Products GP breached the implied covenant, that claim [was also] precluded by Section 7.10(b) of the LPA." [31]

Because the Complaint did not allege a legally sufficient underlying primary claim for breach of a contractual duty or the implied covenant against Enterprise Products GP or its Affiliates regarding the 2009 Sale, the court determined that the secondary liability claims alleged against the remaining Defendants—tortious interference with the LPA and aiding and abetting the general partner's claimed breaches of duty—were *a fortiori* also legally insufficient. Accordingly, the court dismissed those secondary liability claims as well.[32]

### 4. The 2010 Merger

The Court of Chancery next turned to the 2010 Merger claims. Their gist is that

---

**29.** Compare *Norton v. K–Sea Transp. Partners L.P.*, 67 A.3d 354, 2013 WL 2316550 (Del. 2013), which is factually distinguishable. In *K–Sea*, unlike this case, the investment banker opined that the unaffiliated common unitholders of the limited partnership received fair consideration for their units. *Id.* at 366–67. While the unaffiliated common unitholders argued that the general partner obtained excessive consideration for certain incentive distribution rights, the general partner had no contractual duty to evaluate separately the consideration for those incentive distribution rights. *Id.* We held that the investment banker's opinion indirectly addressed the fairness of the incentive distribution rights payment and that the plaintiffs conceded that the unaffiliated common unitholders received fair consideration. *Id.* at 366–69. Here, in contrast, the Morgan Stanley 2009 opinion did not address the consideration that the limited partners received in the 2009 Sale, but instead addressed the 2009 Sale and the separate Teppco LP Sale together.

**30.** *Gerber II, supra* note 5, at *12. If in fact the court misapprehended the scope of the Morgan Stanley 2009 opinion, which was the legal predicate for invoking Section 7.10(b)'s conclusive presumption of good faith, that would constitute reversible error. If Morgan Stanley did not, in fact, opine on the fairness of the consideration of the 2009 Sale, standing alone, EPE's general partner could not have reasonably relied on that opinion to conclude in good faith that the 2009 Sale was fair to the limited partners of EPE.

**31.** *Id.* at *13. The Vice Chancellor went further, by suggesting that the implied covenant could not be invoked despite 6 *Del. C.* § 17–1101(d), which provides that a "partnership agreement may not eliminate the implied contractual covenant of good faith and fair dealing." *Id.* at *13 n. 58 (quoting 6 *Del. C.* § 17–1101(d)). The reason (the court stated) is that the implied covenant is only a "gap filler" that cannot form the basis of a claim based on conduct expressly authorized by a limited partnership agreement. *Id.* Because Enterprise Products GP had an "express contractual right" to rely upon the opinion of an expert and be conclusively presumed to have acted in good faith, the court could not "infer language that contradicts a clear exercise of that right." *Id.* at *13 (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1127 (Del.2010)) (internal quotations omitted). For the reasons discussed in Part IV.A of this Opinion, we reject that reasoning and conclusion.

**32.** In concluding this segment of its opinion, the Court of Chancery, with commendable candor, observed that:

> The facts of this case take the reader *and* the writer to the outer reaches of conduct allowable under 6 *Del. C.* § 17–1101.... Ultimately, the investor, who is charged with having assessed and accepted the risks of putting his money in an entity without the comfort afforded by fiduciary duties, is left with contractual protections, either those that are expressed or those that are within the implied covenant of good faith

the public holders of EPE's LP units were intentionally and wrongfully deprived of the value of EPE's unliquidated 2007 and 2009 Claims in the 2010 Merger—a transaction whose principal purpose was to eliminate those Claims. The court found the 2010 Merger claims were legally deficient for the same reasons that required dismissing the claims challenging the 2009 Sale.

Specifically, the court held that the Defendants could not have breached any express contractual duty of good faith in the 2010 Merger, because Section 7.9(a)'s Special Approval requirements were satisfied. Nor could the Defendants have breached the implied covenant, since Section 7.10(b)'s "conclusive presumption of good faith" precluded any implied covenant claim. Because the Complaint did not state a cognizable primary liability claim for an underlying contractual breach, it also failed, *ipso facto*, to state a claim of secondary liability for tortious interference and for aiding and abetting. Additionally, the court dismissed Gerber's separate unjust enrichment claim without specifically addressing it.[33] The end result was the dismissal of the entire Complaint.

This appeal followed.

### III. THE CONTENTIONS, THE ISSUES, AND THE STANDARD OF REVIEW

#### A. The Parties' Contentions on Appeal

On appeal, Gerber claims that in determining that his Complaint failed to state

any legally sufficient claim for relief, the Court of Chancery reversibly erred. Gerber argues that his Complaint cognizably alleged that: (i) in carrying out the 2009 Sale and the 2010 Merger, Enterprise Products GP and the Director Defendants were subject to both the express contractual duty to act in "good faith" and the implied covenant; and (ii) Enterprise Products GP—aided and abetted by one or more of the remaining Defendants— breached those duties. The Defendants respond that the court properly concluded that they were not subject to, nor did they breach, any duties owed to the partnership or its LP unitholders.

Regarding the 2009 Sale specifically, Gerber claims that the Vice Chancellor erred for three separate reasons. *First,* he argues that as a matter of law Enterprise Products GP and the Director Defendants were contractually obligated to act in good faith—by both the express terms of the LPA and the implied covenant—and that the court erred in holding otherwise.[34] *Second,* he urges that the court erred in holding that the LPA's "conclusive presumption of good faith" provision absolved the Defendants of liability for bad faith conduct, because the Morgan Stanley 2009 opinion was so flawed that it could not be the subject of any good faith reliance by the Defendants, since it did not address the relevant issue—the fairness of the 2009 Sale specifically. *Third,* Gerber con-

---

and fair dealing. Here, those protections were minimal and did not provide EPE's public investors with anything resembling the protections available at common law. *Id.* at *13 (emphasis in original).

33. Because the Vice Chancellor did not address the unjust enrichment claim, we as a reviewing court decline to consider, as an original matter, whether a claim of that kind is legally maintainable in this context, and if so, whether Gerber adequately pled a claim

for unjust enrichment. Given our disposition of this appeal, the Court of Chancery shall address the unjust enrichment claim on remand.

34. Gerber also contends that the duty to act in good faith is rooted in "residual fiduciary duties." Because we decide this case on other grounds, we do not reach or address Gerber's "residual fiduciary duty" argument.

tends that as a matter of law the "conclusive presumption" provision of the LPA cannot absolve the Defendants from liability for bad faith conduct, and that in concluding that Section 7.10(b) provided such absolution, the court reversibly erred.

To these arguments the Defendants respond that the Director Defendants had no duties under the implied covenant, because the implied covenant applies only to Defendant(s) who signed the LPA—here, only Enterprise Products GP. Moreover, and in any event, the Defendants' compliance with the LPA's "Special Approval" provision relieved them of any liability under the LPA's contractual good-faith standard. Alternatively, even if the implied covenant applies to the Defendants, they did not breach the implied covenant, because the Morgan Stanley 2009 opinion was a proper subject of reliance by Enterprise Products GP. Therefore, under Section 7.10 of the LPA, Enterprise Products GP was entitled to be "conclusively presumed" to have acted in good faith, and thereby insulated from any claim of liability asserted against the general partner or any other Defendant, even under the implied covenant.

Regarding the 2010 Merger, Gerber claims that the Court of Chancery erroneously held that the Defendants did not breach either their contractual duty of good faith or the implied covenant. In support, Gerber reiterates his earlier contentions in connection with the 2009 Sale,[35] but also advances new ones. He contends that the "Special Approval" safe harbor of Section 7.9(a)(i) and the "conclusive presumption" provision of Section 7.10(b) can-

not insulate Defendants from liability for bad faith conduct under the LPA's express contractual duty of good faith or the implied covenant. Gerber also urges that the implied covenant applies not only to Enterprise Products GP, but also to the remaining Defendants, even though they were not formal parties to the LPA.

To these arguments the Defendants reiterate their responses to Gerber's 2009 Sale-related arguments, and advance new ones as well. The Defendants argue that the Court of Chancery correctly held that they breached no contractual duty to act in good faith, because the 2010 Merger was separately approved under Section 7.9(a)(i)'s "Special Approval" safe harbor process. In addition, Section 7.10(b)'s "conclusive presumption" precludes claims under the implied covenant, because: (i) the implied covenant is merely a "gap filler" that cannot override the Defendants' express contractual right to rely upon the protections of Sections 7.9(a) and 7.10(b); and (ii) in any event, the implied covenant applies only to parties to the LPA (here, only Enterprises Products GP), which relied on the Morgan Stanley 2010 opinion and consequently became entitled to the LPA's conclusive good faith presumption.

### B. The Issues

Although these contentions raise a plethora of legal disputes, the issues that are dispositive of this appeal can be reduced to three. The first is whether the plaintiff's claims of liability are all precluded (as the court held) by the "conclusive presumption

---

**35.** Gerber contends that the Morgan Stanley 2010 opinion was also flawed, and consequently unworthy of reliance, because it failed to value the 2007 and 2009 Claims in its analysis of the fairness of the 2010 Merger. That claim derives support from the opinion of a different Vice Chancellor in a related action. *See Brinckerhoff v. Tex. E. Prods. Pipe-*

*line Co.,* 986 A.2d 370, 394 (Del.Ch.2010) ("All of these financial analyses suggest that the Merger offered a fair price for [the company] *without* the [derivative claim]. They do not address whether the consideration was fair *with* the [derivative claim]." (emphasis in original)).

of good faith" provision of Section 7.10(b). If Section 7.10(b) does not bar a claim under the implied covenant, as Gerber contends, then that provision cannot foreclose judicial inquiry into the legal sufficiency of Gerber's claims. For the reasons discussed in Part IV.A of this Opinion, we determine that the "conclusive presumption" provision in EPE's LPA does not bar Gerber's claims.

That determination raises the second issue, which is whether, because the conclusive presumption does not bar Gerber's claims, the Complaint adequately pleads that EPE's general partner (Enterprise Products GP) breached the implied covenant. As for the 2009 Sale, the Court of Chancery answered that question in the affirmative.[36] The court determined that absent the LPA's conclusive presumption provision, the Complaint alleged cognizable claims for breach of the implied covenant against Enterprise Products GP.[37] The Defendants have not cross-appealed from that adverse determination. Therefore, at this stage that determination is the law of the case.[38] We also conclude independently that Gerber has pled a cognizable breach of the implied covenant. As for the 2010 Merger, it is arguable (although somewhat less clear) that the court reached the same conclusion. To the extent the court did not determine the legal sufficiency of the implied covenant claim specific to the 2010 Merger, we independently conclude that the Complaint alleged an implied covenant claim legally sufficient to survive dismissal.

Our disposition of the first two issues requires that the judgment of dismissal be reversed and that the case be remanded for further proceedings. For the guidance of the parties and the trial court on remand, we also identify a third set of issues. They are: (1) the conclusive presumption having been found not to bar a claim under the implied covenant, what Defendants (if any) other than the general partner are subject to claims of secondary liability for tortious interference and/or aiding and abetting a breach of contract; and (2) to the extent any Defendant is subject to those claims, does the Complaint adequately plead them?[39] Because the Court of Chancery did not address these issues in the first instance, neither do we. Those issues shall be addressed on remand.

### C. The Standard of Review

■ Because we are asked to review the dismissal of a complaint for failure to state a claim under Court of Chancery Rule 12(b)(6), our review is *de novo*.[40] Because the issues presented all require a judicial construction of the LPA and appli-

---

**36.** *Gerber II, supra* note 5, at *11 ("The Complaint can fairly be read to allege that Enterprise Products GP acted in bad faith when it chose to use the Special Approval process."). The court also held that "the well-pled facts of the Complaint may suggest that Enterprise Products GP breached the implied covenant. . . ." *Id.* at *13.

**37.** *Id.* at *11, *13.

**38.** *See Scharf v. Edgcomb Corp.*, 864 A.2d 909, 914 (Del.2004) ("No cross-appeal was filed by [the defendant-appellee] and that [Court of Chancery] holding is now the law of this case.").

**39.** The Court of Chancery found as a matter of law that Duncan, EPCO, and the Director Defendants were not subject to any express contractual duties, because they were protected by Section 7.9(a), which eliminated their express fiduciary duties as authorized by Section 1101(d) of the DRULPA. *Gerber II, supra* note 5, at *11 n.46. The court also found that Duncan, EPCO, and the Director Defendants were not signatories to the LPA and, thus, were not subject to the implied covenant. *Id.*

**40.** *Cent. Mortg. Co. v. Morgan Stanley*, 27 A.3d 531, 535 (Del.2011) (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896 (Del.2002)).

cation of the DRULPA, those issues involve questions of law that are also reviewed *de novo*.[41]

## IV. ANALYSIS

### A. The LPA's Conclusive Presumption of Good Faith Does Not Bar a Claim Under the Implied Covenant

■ We begin our analysis by addressing LPA Section 7.10(b)'s conclusive presumption of good faith. We start there because the foundational premise of the Court of Chancery's analysis is that Section 7.10(b) bars any claim under the implied covenant. With respect to the 2009 Sale, the Vice Chancellor explicitly held that:

> The Complaint can fairly be read to allege that Enterprise Products GP acted in bad faith when it chose to use the [Section 7.9(a)] Special Approval Process.... According to the Complaint, the 2009 Sale was a grossly unfair transaction that involved EPE selling an asset for $100 million that two years previously it had purchased for $1.1 billion. The Complaint can fairly be read to allege that because the terms of the 2009 Sale were so unfair to EPE, the 2009 Sale would not be able to meet the second, third or fourth standard established by Section 7.9(a). Thus, if Enterprise Products GP was going to be able to get EPE to undertake the 2009 Sale free from challenge, Enterprise Products GP would have to obtain Special Approval of the 2009 Sale. According to the Complaint, Enterprise Products GP decided that the 2009 Sale benefited its

controller and, then, ... found a way to use one of Section 7.9(a)'s standards to prevent this Court or anyone else from reviewing it. That is an allegation that Enterprise Products GP exercised, in bad faith, the discretion it had to use the Special Approval process to take advantage of the LPA's duty limitations.[42]

The Court of Chancery further concluded that "[a]lthough the well-pled facts of the Complaint may suggest that Enterprise Products GP breached the implied covenant, that claim is precluded by Section 7.10(b) of the LPA."[43]

With respect to the 2010 Merger claims—*viz.*, that "the public holders of EPE LP units failed to receive value for certain of EPE's unliquidated claims"[44]— the court held that even if the Complaint stated a legally cognizable claim under the implied covenant, that claim was also foreclosed by Sections 7.9(a)(i) and 7.10(b):

> [T]he Merger received Special Approval. Therefore, any claim that the Defendants breached express duties by causing EPE to enter into the Merger fails, as a matter of law, under Section 7.9(a) of the LPA. Turning to the implied covenant, even if Gerber could, absent the LPA, plead a breach of it, that claim would be precluded by Section 7.10(b). Enterprise Products GP is conclusively presumed to have acted in good faith in entering into the Merger because "Morgan Stanley rendered to the ... ACG Committee its oral opinion, subsequently confirmed in writing, that, as of such date ... the [Merger] exchange ratio ... was fair from a financial point of

**41.** *Progressive N. Ins. Co. v. Mohr*, 47 A.3d 492, 495 (Del.2012) (citing *CML V, LLC v. Bax*, 28 A.3d 1037, 1040 (Del.2011)); *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 170 (Del.2002) (citing *Schock v. Nash*, 732 A.2d 217, 224 (Del. 1999)).

**42.** *Gerber II, supra* note 5, at *11 (citations omitted).

**43.** *Id.* at *13.

**44.** *Id.*

view to the holders of ... [EPE's LP] units...." [45]

We conclude, for the following reasons, that the foundational premise of the court's reasoning is flawed. Specifically, insofar as Section 7.10(b) creates a conclusive presumption of good faith, that provision does not bar a claim under the implied covenant.

■■■■■ The flaw in the court's reasoning stems from a decision by the LPA's drafters to define a contractual fiduciary duty in terms of "good faith"—a term that is also and separately a component of the "implied covenant of *good faith* and fair dealing." Although that term is common, the LPA's contractual fiduciary duty describes a concept of "good faith" very different from the good faith concept addressed by the implied covenant. In *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, the Court of Chancery articulated the important differences between the implied covenant and the fiduciary duty concepts of good faith.[46] We adopt this well-reasoned analysis as a correct statement of our law:

> The implied covenant seeks to enforce the parties' contractual bargain by implying only those terms that the parties would have agreed to during their original negotiations if they had thought to address them. Under Delaware law, a court confronting an implied covenant claim asks whether it is clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to pro-

scribe the act later complained of as a breach of the implied covenant of good faith—had they thought to negotiate with respect to that matter. While this test requires resort to a counterfactual world—what if—it is nevertheless appropriately restrictive and commonsensical.

The temporal focus is critical. Under a fiduciary duty or tort analysis, a court examines the parties as situated at the time of the wrong. The court determines whether the defendant owed the plaintiff a duty, considers the defendant's obligations (if any) in light of that duty, and then evaluates whether the duty was breached. Temporally, each inquiry turns on the parties' relationship as it existed at the time of the wrong. The nature of the parties' relationship may turn on historical events, and past dealings necessarily will inform the court's analysis, but liability depends on the parties' relationship when the alleged breach occurred, not on the relationship as it existed in the past.

An implied covenant claim, by contrast, looks to the past. It is not a free-floating duty unattached to the underlying legal documents. It does not ask what duty the law should impose on the parties given their relationship at the time of the wrong, but rather what the parties would have agreed to themselves had they considered the issue in their original bargaining positions at the time of contracting. "Fair dealing" is not akin to the fair process component of entire fairness, *i.e.*, whether the fiducia-

---

45. *Id.* at *14 (citations omitted). In a footnote, the court further ruled that "[a]ssuming the Complaint asserts a claim that the Proxy failed to adequately disclose the value of the 2007 and 2009 Claims, that claim also fails as a matter of law." *Id.* at *14 n. 66 (quoting *Lonergan v. EPE Hldgs., LLC*, 5 A.3d 1008,

1024 (Del.Ch.2010) (The LPA "eliminates all fiduciary duties, which therefore cannot support a *disclosure obligation*.")).

46. 50 A.3d 434, 440–42 (Del.Ch.2012), *aff'd in part, rev'd in part on other grounds*, 68 A.3d 665, 2013 WL 1914714 (Del.2013).

ry acted fairly when engaging in the challenged transaction as measured by duties of loyalty and care whose contours are mapped out by Delaware precedents. It is rather a commitment to deal "fairly" in the sense of consistently with the terms of the parties' agreement and its purpose. *Likewise "good faith" does not envision loyalty to the contractual counterparty, but rather faithfulness to the scope, purpose, and terms of the parties' contract. Both necessarily turn on the contract itself and what the parties would have agreed upon had the issue arisen when they were bargaining originally.*

The retrospective focus applies equally to a party's discretionary rights. The implied covenant requires that a party refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of its bargain. *When exercising a discretionary right, a party to the contract must exercise its discretion reasonably.* The contract may identify factors that the decision-maker can consider, and it may provide a contractual standard for evaluating the decision. Express contractual provisions always supersede the implied covenant, but even the most carefully drafted agreement will harbor residual nooks and crannies for the implied covenant to fill. In those situations, what is "arbitrary" or "unreasonable"—or conversely "reasonable"—depends on the parties' original contractual expectations, not a "free-floating" duty applied at the time of the wrong.[47]

Although the court in *ASB Allegiance* was comparing the analysis under the implied covenant to the analysis under common law fiduciary duty precepts, its reasoning applies equally to contractual fiduciary duties, such as the LPA's "good faith" standard. Under Section 7.9(b), Enterprise Products GP and its Affiliates must make all determinations and take or decline to take any action in "good faith." The LPA defines "'good faith' for purposes of this Agreement" as a "belie[f] that the determination or other action is in the best interests of the Partnership." Like a common law fiduciary duty, Section 7.9(b)'s contractual fiduciary duty analysis looks to the parties as situated at the time of the wrong, and inquires whether Enterprise Products GP or its Affiliates "believe[d] that the determination or other action [was] in the best interests of the Partnership." That is different from the standard that is embedded in the implied covenant.

LPA Section 7.10(b)'s conclusive presumption must be read together with Section 7.9(b). Section 7.9(b) imposes a contractual fiduciary duty to act in "good faith," and defines "good faith" for the "purposes of this [a]greement." Under Section 7.10(b), Enterprise Products GP and its Affiliates are conclusively presumed to have met this standard if they rely upon the opinion of a qualified expert advisor. Nothing in Section 7.10(b) pertains to or addresses the implied covenant.

The reasoning in the Vice Chancellor's opinion improperly conflates two distinct concepts—the implied covenant and the LPA's contractual fiduciary duty—and ignores the temporal distinction between them.[48] Section 7.10(b) is a contractual

---

47. *Id.* (italics added) (footnotes, citations, and internal quotations omitted).

48. In its opinion the court suggests that an express contractual provision that *does* eliminate the implied covenant might withstand

judicial scrutiny. *See Gerber II, supra* note 5, at *13 & n. 58. That reasoning labors under two related but fatal infirmities. First, it evades the command of DRULPA § 1101(d). Second, it does that by misinterpreting and

provision that establishes a procedure the general partner may use to conclusively establish that it met its contractual fiduciary duty. But, the implied covenant attaches to Section 7.10(b), as it attaches to the rest of the LPA.[49] Therefore, Enterprise Products GP's attempt to take advantage of Section 7.10(b) may itself be subject to a claim that it was arbitrary and unreasonable and in violation of the implied covenant. The conclusive presumption of "good faith" applies only to the contractual fiduciary duty. It cannot operate retroactively to alter the parties' reasonable expectations at the time of contracting, and it cannot be used to fill every gap in the LPA.

Were we to adopt the Vice Chancellor's construction of Section 7.10(b), that would lead to nonsensical results. Examples readily come to mind of cases where a general partner's actions in obtaining a fairness opinion from a qualified financial advisor themselves would be arbitrary or unreasonable, and "thereby frustrat[e] the fruits of the bargain that the asserting party reasonably expected."[50] To suggest one hypothetical example, a qualified financial advisor may be willing to opine that a transaction is fair even though (unbeknownst to the advisor) the controller has intentionally concealed material information that, if disclosed, would require the advisor to opine that the transaction price is in fact not fair.[51] More extreme would be a case where the controller outright bribes the financial advisor to opine (falsely) that the transaction is fair. In a third example, the financial advisor, eager for future business from the controller, compromises its professional valuation standards to achieve the controller's un-

---

misapplying *Nemec v. Shrader*, 991 A.2d 1120 (Del.2010). Under the court's reasoning, even if a partnership agreement eliminates the implied covenant *de facto* by creating a conclusive presumption that renders the covenant unenforceable, the presumption remains legally incontestable. The reason (the court stated) is that under *Nemec*, the implied covenant is merely a "gap filler" that by its nature must always give way to, and be trumped by, an "express" contractual right that covers the same subject matter. *Id.* at *12 (citing *Nemec*, 991 A.2d at 1127).

That reasoning does not parse. The statute explicitly prohibits any partnership agreement provision that eliminates the implied covenant. It creates no exceptions for contractual eliminations that are "express." Although our Opinion in *Nemec* characterized the implied covenant as a "gap filler," that description cannot fairly be read to support the court's reasoning or result in this case. Our *Nemec* Opinion was not intended to be, nor should it be read as, an open-ended invitation to scriveners of partnership agreements to "fill the gap" by employing "express" contractual provisions that manifestly contravene Section 1101(d) of the DRULPA.

Suppose that Section 7.10(b) of the LPA provided (instead of its actual language) that "no

Partner, or Affiliate of any Partner, shall have any duty, arising out of the implied covenant of good faith and fair dealing, to act in good faith; nor shall a claim that any such duty was breached be enforceable in any court of law or equity." It cannot seriously be argued that that provision (as worded) would survive scrutiny under Section 1101(d) of the DRULPA. In every meaningful sense, that hypothetical LPA provision "eliminates" the implied covenant—a result that the statute plainly proscribes. Under the court's reasoning, however, that (hypothetical) provision would pose no legal obstacle, because it creates an "express right" not to be subject to the implied covenant or any claim.

49. *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del.2005) (citations omitted) (noting that "the implied covenant attaches to every contract").

50. *Nemec*, 991 A.2d at 1126 (citing *Dunlap*, 878 A.2d at 442).

51. *See, e.g., In re Emerging Commc'ns Inc. S'holders Litig.*, 2004 WL 1305745, at *25 (Del.Ch. June 4, 2004).

fair objective.[52] Although plaintiffs could properly challenge this conduct under the implied covenant, the court's reasoning, if upheld, would preclude those claims. We therefore conclude that the Court of Chancery erred in holding that Section 7.10(b) bars a claim under the implied covenant.

 Having so determined, we next analyze whether Gerber has pled facts that, if true, would establish that Enterprise Products GP breached the implied covenant.[53] Applying the implied covenant is a "cautious enterprise" and we will only infer "contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated."[54] Gerber must show that Enterprise Products GP "acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that [Gerber] reasonably expected."[55] "When conducting this analysis, we must assess the parties' reasonable expectations at the time of contracting;"[56] and will not imply terms to "rebalanc[e] economic interests after events that could have been anticipated, but were not, that later adversely affected one party to a contract."[57]

According to the Complaint, the 2009 Sale was a grossly unfair transaction wherein the Defendants caused EPE to sell Teppco GP to Enterprise Products LP for only 9% of EPE's original purchase price. Enterprise Products GP, acting through its ACG Committee, obtained the Morgan Stanley 2009 opinion to trigger Section 7.10(b)'s conclusive presumption that Enterprise Products GP satisfied its contractual duty of good faith. The Complaint pleads that the Morgan Stanley 2009 opinion did *not* address whether holders of EPE's LP units received fair consideration

---

52. *See In re S. Peru Copper Corp. S'holder Derivative Litig.*, 52 A.3d 761 (Del.Ch.2011), *aff'd sub nom. Americas Mining Corp. v. Theriault*, 51 A.3d 1213 (Del.2012). Although in these cases, a plaintiff might argue that the controller did not "rely" on the investment banker's opinion, it is easy to imagine alternative versions of Section 7.10(b) that do not use the term *reliance*.

53. We reject Gerber's argument that the implied covenant applies to nonparties to the contract. Both the Superior Court and Court of Chancery have held that the implied covenant only binds parties to the contract. *Brinckerhoff v. Enbridge Energy Co.*, 2011 WL 4599654, at *11 (Del.Ch. Sept. 30, 2011) (citing *Nemec*, 991 A.2d at 1126), *aff'd*, 67 A.3d 369, 2013 WL 2321598 (Del.2013) (noting, however, that the plaintiff did "not really challenge" the Court of Chancery's holding on the implied covenant claim, and that therefore, "[t]his type of 'throw away' argument is not sufficient to gain any traction" on appeal); *Castetter v. Del. Dep't of Labor*, 2002 WL 819244, at *3 (Del.Super. Apr. 30, 2002) (citation omitted); *see also* Myron T. Steele, *Judicial Scrutiny of Fiduciary Duties in Delaware Limited Partnerships and Limited Liability Companies*, 32 Del. J. Corp. L. 1, 17 (2007)

(citation omitted). Moreover, the General Assembly used the term "implied contractual covenant of good faith and fair dealing" in the DRULPA. 6 *Del. C.* § 17–1101(d). We refer to the common law to determine the proper meaning of an undefined term in a statute, and therefore conclude that the General Assembly intended to import the common law meaning of the implied covenant when it enacted the DRULPA. *Porter v. Delmarva Power & Light Co.*, 547 A.2d 124, 128 (Del. 1988) (holding that "when the statute under construction does not define its terms[,] it is proper to refer to the common law for the meaning of disputed language"). We do not address whether Gerber can hold the other Defendants liable under a secondary liability theory. *See supra* text accompanying note 39.

54. *Nemec*, 991 A.2d at 1125 (citing *Dunlap*, 878 A.2d at 441).

55. *Id.* at 1126 (citing *Dunlap*, 878 A.2d at 442).

56. *Id.* (citing *Cont'l Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1234 (Del.Ch.2000)).

57. *Id.* at 1128.

for their Teppco GP interest. Instead, Morgan Stanley addressed only the total consideration paid in both the Teppco LP Sale (which did not include any consideration for EPE's LP unitholders) and the 2009 Sale, and explicitly disclaimed to opine as to the fairness of any specific component of the total consideration.

As the Vice Chancellor noted, the LPA's "protections were minimal" and "did not provide EPE's public investors with anything resembling the protections available at common law." [58] But even though Gerber forewent the protections available under common law fiduciary principles, he still retained a reasonable contractual expectation that the Defendants would properly follow the LPA's substitute standards. That requires us to decide whether an implied covenant claim is stated where the defendant allegedly has attempted to satisfy its contractual obligations by relying on a fairness opinion that did not value the consideration that the LP unitholders actually received.

We answer that question in the affirmative. When Gerber purchased EPE LP units, he agreed to be bound by the LPA's provisions, which conclusively deemed Enterprise Products GP's contractual fiduciary duty to be satisfied, if Enterprise Products GP relied upon the opinion of a qualified expert. At the time of contracting, however, Gerber could hardly have anticipated that Enterprise Products GP would rely upon a fairness opinion that did not fulfill its basic function—evaluating the consideration the LP unitholders received for purposes of opining whether the transaction was financially fair.[59] Although Section 7.10(b) does not prescribe specific standards for fairness opinions, we may confidently conclude that, had the parties addressed the issue at the time of contracting, they would have agreed that any fairness opinion must address whether the consideration received for Teppco GP in 2009 was fair, in order to satisfy Section 7.9(b)'s contractual fiduciary duty.[60] Gerber has pled that Enterprise Products GP engaged in a manifestly unfair transaction, and then relied on an unresponsive fairness opinion, to ensure that its contractual fiduciary duty would be conclusively presumed to have been discharged. That is the type of arbitrary, unreasonable conduct that the implied covenant prohibits.

■ A similar analysis applies equally to the 2010 Merger challenges. The Vice Chancellor held that the Complaint pled that a principal purpose of the 2010 Merger was to terminate the 2007 and 2009 Claims. Despite that purpose, Morgan Stanley did not independently value the 2007 and 2009 Claims in assessing the 2010 Merger's fairness in that firm's 2010 opinion, nor did Enterprise Products GP obtain another valuation. Although the Morgan Stanley 2010 opinion stated that the 2010 Merger consideration was fair without considering the 2007 and 2009 Claims; it did not "address whether the consideration was fair *with* the [2007 and 2009

---

58. *Gerber II, supra* note 5, at *13.

59. *Cf. Norton v. K–Sea Transp. Partners L.P.,* 67 A.3d 354, 367, 2013 WL 2316550, at *8 (Del.2013) (noting that the plaintiff "nowhere claims that the [fairness] opinion did not state that the [m]erger was fair, nor does he allege that the analyses underlying the fairness opinion were flawed").

60. *Cf. Nemec,* 991 A.2d at 1127 (holding that a plaintiff could not plead an implied covenant violation, where the defendant company exercised its "absolute contractual right to redeem the retired stockholders' shares at a time that was most advantageous to the [c]ompany's working stockholders").

Claims]."[61] Gerber could not fairly be charged with having anticipated that Enterprise Products GP would merge EPE for the purpose of eliminating EPE's derivative claims, but then rely on a fairness opinion that did not even consider those claims' value. Although Section 7.10(b) does not explicitly so require, we conclude that the parties would certainly have agreed, at the time of contracting, that any fairness opinion contemplated by that provision would address the value of derivative claims where (as here) terminating those claims was a *principal purpose* of a merger. Therefore, Gerber has sufficiently pled that Enterprise Products GP breached the implied covenant in the course of taking advantage of Section 7.10(b)'s conclusive presumption.

Although Gerber has pled that Enterprise Products GP breached the implied covenant, that does not end the analysis. If Enterprise Products GP independently satisfied the contractual Special Approval safe harbor in Section 7.9(a), then by Section 7.9(a)'s plain language, the general partner did not breach the LPA. Therefore the Court must address this second layer of contractual insulation, and determine whether the Complaint cognizably alleges that Enterprise Products GP violated the implied covenant in its effort to comply with Section 7.9(a). We conclude that it does.

## B. The Complaint Pleads Legally Sufficient Claims that the General Partner of EPE Breached the Implied Covenant in Carrying Out the Challenged Transactions

■ As noted, the second layer of contractual insulation from judicial review is the "Special Approval" process that is a

safe harbor from liability under Section 7.9(a)(i) of the LPA. Both transactions under attack in this case were made subject to the Special Approval process. Under LPA Section 7.9(a), compliance with that process relieves the general partner (Enterprise Products GP) of any duty, in law or equity. That safe harbor, however, is limited. The selection and carrying out of the Special Approval process must satisfy both the express overarching contractual duty in Section 7.9(b) to act in good faith and the duty under the implied covenant.

The ACG Committee gave the 2009 Sale and 2010 Merger Special Approval and relied on a fairness opinion in doing so. Without considering the implied covenant claims, Section 7.10(b)'s conclusive presumption and Section 7.9(a)'s safe harbor apply and therefore, Enterprise Products GP is presumed to have complied with its contractual duty to act in good faith. Accordingly, the Court of Chancery properly dismissed Gerber's claims alleging violations of the LPA's contractual fiduciary duty of good faith. But, the Court of Chancery also correctly held that the implied covenant independently constrains the Special Approval process. We conclude that Gerber has pled claims that, in its attempt to obtain Special Approval, Enterprise Products GP breached the implied covenant.

With respect to the 2009 Sale, the Court of Chancery held that: (i) Enterprise Products GP had a duty under the implied covenant to exercise its discretion reasonably when choosing the Special Approval process,[62] and (ii) absent the conclusive presumption, the Complaint stated a legally sufficient claim that Enterprise Products GP breached the implied covenant.[63]

**61.** *Brinckerhoff v. Tex. E. Prods. Pipeline Co.,* 986 A.2d 370, 394 (Del.Ch.2010).

**62.** *Gerber II, supra* note 5, at *11.

**63.** *Id.* at *11–12.

Because we hold *supra* that the LPA's conclusive presumption does not bar a claim under the implied covenant, the Special Approval process itself is subject to judicial review.

The Court of Chancery held that the Complaint cognizably alleges that the general partner selected the Special Approval process in bad faith in breach of its duties under the implied covenant.[64] The Defendants have not cross-appealed from this Court of Chancery determination,[65] which therefore stands as the law of the case.[66] The Complaint states cognizable contractual claims for relief with respect to the 2009 Sale, and the dismissal of those claims was reversible error.

The Court of Chancery held that Gerber pled that Enterprise Products GP breached the implied covenant when it selected the Special Approval process from among Section 7.9(a)'s four alternatives. Our independent review of the Complaint confirms that it alleges an implied covenant violation that survives a motion to dismiss. The LPA defines Special Approval as "approval by a majority of the members of the [ACG] Committee"[67] and does not expressly require the ACG Committee to follow any particular process in order to grant Special Approval. Even so, the implied covenant constrains how the Special Approval process may be carried out.

Here, Defendants argue that the ACG Committee relied on the Morgan Stanley 2009 opinion when it granted Special Approval. We have held that Gerber could not have anticipated that Enterprise Products GP would rely upon a fairness opinion that failed to evaluate the consideration the LP unitholders received when concluding that the 2009 Sale was fair. Nor could Gerber have anticipated that the ACG Committee would grant Special Approval based on their reliance on such a flawed opinion. Although the ACG Committee had no contractual duty to obtain a fairness opinion, the parties would not have agreed that the ACG Committee could obtain and rely on a fairness opinion so flawed.

■ We reach the same conclusion with respect to the 2010 Merger claim. That claim is that Enterprise Products GP did not act in good faith in effectuating the Merger, because that transaction was primarily intended to-and did-terminate EPE's 2007 and 2009 Claims without compensating EPE's LP unitholders for their value. In its opinion, the Court of Chancery recognized that "the general partner may enter into a merger, a principal purpose of which is to terminate claims belonging to the limited partnership, *so long as the general partner considers the value of those claims in determining whether to enter into the merger.*"[68] The Complaint alleged, and the court found, that a principal purpose of the 2010 Merger was to eliminate EPE's 2007 and 2009 Claims, and that those claims were not valued in fixing the merger consideration. The court

---

**64.** *Id.* at *11.

**65.** Because the Defendants did not file a cross appeal, we decline to review the Court of Chancery's conclusion that Enterprise Products GP breached the implied covenant when it chose between the four contractually-defined alternatives in Section 7.9(a)'s safe harbor provision. *Compare id., with Nemec,* 991 A.2d at 1125–26 (citations omitted).

**66.** *See Scharf v. Edgcomb Corp.,* 864 A.2d 909, 914 (Del.2004) ("No cross-appeal was filed by [the defendant-appellee] and that [Court of Chancery] holding is now the law of this case.").

**67.** Attachment I to the LPA ("Defined Terms").

**68.** *Gerber II, supra* note 5, at *6 (italics added) (citation omitted).

found, however, that although Enterprise Products GP, as EPE's general partner, had an express contractual duty to carry out that transaction in good faith, the general partner did not breach that duty because the Special Approval process precluded any claim of breach on that ground.[69] Moreover, the LPA's Section 7.10(b) conclusive presumption precluded the court from even addressing whether the Complaint alleged a legally sufficient breach of the implied covenant.[70]

It is inferable from both the Complaint and the Court of Chancery opinion that, but for the LPA's Special Approval process and Section 7.10(b)'s conclusive presumption, the court would have found that the Complaint cognizably alleged that the general partner breached the implied covenant in carrying out the 2010 Merger. There is, however, room for debate on that score, because the court did not specifically address the implied covenant claim in the 2010 Merger context. We, however, are able to analyze the Complaint independently and conclude that it states legally sufficient claims that the general partner breached the implied covenant in carrying out the 2010 Merger.

The Complaint alleges that: (i) a principal purpose of that Merger was to eliminate the 2007 and 2009 Claims belonging to EPE, (ii) those claims were not valued either by the general partner or Morgan Stanley in fixing the Merger consideration or in opining on its fairness to the LP unitholders of EPE, and (iii) the general partner was aware of those facts. Shorn of the insulating presumption created by Section 7.10(b) and Section 7.9(a) of the LPA, those pled facts permit a reasonable inference that the 2010 Merger was the product of a breach of the general partner's duty under the implied covenant.

Although the LPA does not expressly forbid the general partner from acting in this alleged fashion when effecting a merger, it is reasonably inferable that, had the parties focused on that question at the time of contracting, they would have proscribed such conduct. At this stage it cannot be concluded as a matter of law, that the LP unitholders would have agreed to allow the general partner to act in that manner. The LP unitholders had a reasonable expectation that if the general partner chose to terminate their investment by way of a merger primarily intended to eliminate valuable assets of the limited partnership (here, the 2007 and 2009 Claims), the LP unitholders would be compensated for the value of those eliminated claims. The parties would not have agreed to allow the general partner to eliminate those claims and also to exclude their value from the 2010 Merger consideration.

We conclude that, in holding that the Complaint failed to state a cognizable claim for relief in connection with the 2010 Merger, the Court of Chancery reversibly erred.

### C. The Claims of Liability Against the General Partner's Affiliates

Our analysis thus far has focused on the liability claims against EPE's general partner, Enterprise Products GP. The Complaint, however, also asserts primary claims of liability against the remaining Defendants for breach of express and implied contractual duties, as well as secondary liability claims for tortious interference with contract rights and aiding and abetting the general partner's breach of contract.

The Court of Chancery held that the "safe harbor" and "conclusive presump-

<hr>

69. *Id.* at *8, *14.

70. *Id.* at *14.

426

tion" provisions of the LPA precluded the primary liability claims, and, as a consequence, precluded the secondary liability claims as well. Because we determine that the LPA insulating presumptions do not automatically foreclose these claims against the remaining Defendants, the legal sufficiency of those claims must be addressed. Specifically it must be decided: (i) which (if any) of the remaining Defendants are subject to any of the secondary claims of liability described above; and (ii) to the extent any or all of the remaining Defendants are subject to those claims, whether the Complaint alleges such claims in a legally cognizable manner.

Because the Court of Chancery did not address those issues in the first instance, that court is instructed to do so on remand.

## V. CONCLUSION

For the above reasons, the judgment of the Court of Chancery is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with the rulings in this Opinion. Jurisdiction is not retained.