**AFFIRM; and Opinion Filed August 22, 2016.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-14-01215-CV

**PATRICK DAUGHERTY, Appellant/Cross-Appellee**
**V.**
**HIGHLAND CAPITAL MANAGEMENT, L.P., Appellee/Cross-Appellant**

**HIGHLAND EMPLOYEE RETENTION ASSETS LLC, Appellant**
**V.**
**PATRICK DAUGHERTY, Appellee[1]**

**On Appeal from the 68th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. 12-04005**

## MEMORANDUM OPINION
Before Justices Lang, Brown, and Whitehill
Opinion by Justice Brown

From a judgment following a jury trial, Highland Capital Management, L.P.

("Highland"), Patrick Daugherty, and Highland Employee Retention Assets LLC ("HERA"),

each appeal:

- Daugherty challenges the judgment's award of $2.8 million in attorney's fees and an injunction against him in Highland's favor;

- Highland challenges the jury's finding of zero appellate attorney's fees; and

---

[1] In our Order of March 3, 2015, we directed the Clerk of the Court to re-align the parties as designated here. Four other parties were designated as third-party defendants in the trial court's judgment and as appellees in our order. These parties, Sierra Verde, LLC, Patrick Boyce, William L. Britain, and James Dondero, have not appeared in this appeal, nor does any party to this appeal seek relief from them. We therefore do not include them in the caption to this appeal or in our judgment.

- HERA challenges the judgment of $2.6 million against it for breach of an implied duty of good faith and fair dealing.

We conclude that (1) the trial court did not err by rendering judgment against Daugherty; (2) Highland failed to preserve error regarding the jury's finding of no appellate attorney's fees; and (3) the trial court did not err in rendering judgment against HERA. Accordingly, we affirm the trial court's judgment.

## BACKGROUND

Because the facts are well known to the parties and the appellate record is extensive, we include only limited background information here. We will discuss the facts in more detail in our analysis below as pertinent to the specific issues raised by the parties.

Highland brought suit against Daugherty, its former employee, for claims including breach of contract, breach of fiduciary duty, defamation, and theft of trade secrets. Daugherty answered and asserted counterclaims against Highland including breach of contract and defamation, and also asserted claims against HERA including breach of contract and conversion. The case proceeded to a jury trial. Relevant to the parties' appeals, the jury found (1) Daugherty breached his contracts with Highland; (2) Highland's damages from the breaches of contract were zero; (3) Highland's attorney's fees for trial were $2.8 million; (4) Highland's appellate attorney's fees were zero; (5) HERA breached an implied covenant of good faith and fair dealing; and (6) Daugherty's damages from that breach were $2.6 million. The trial court rendered judgment on the jury's verdict and imposed a permanent injunction against Daugherty barring him from using or disseminating Highland's confidential information. Highland, Daugherty, and HERA each challenge the trial court's judgment.

## I. Award of attorney's fees to Highland

Daugherty's first issue challenges the judgment's award of $2.8 million in attorney's fees to Highland. He contends Highland is not entitled to attorney's fees either under the parties' contracts or by statute. He argues Highland failed to plead or tender a jury question for contractual attorney's fees, and is not entitled to attorney's fees by statute because the jury found zero damages on Highland's claim for breach of contract. We address each complaint in turn.

### A. Failure to plead

We first conclude that Highland's pleading was sufficient to assert a claim for attorney's fees under two contracts that Highland claimed Daugherty breached. Section VI of Highland's operative petition was entitled "Breach of Contract." In that section, Highland alleged that Daugherty breached two contracts, an employment agreement and a "buy-sell" agreement. A copy of the employment contract was attached to the petition. Highland also quoted the following provision from Article V of the employment agreement (entitled "Confidentiality, Non-Competition, Non-Solicitation, and Non-Recruitment") in paragraph 17 of the petition:

> In the event of a breach by the Executive of any provision of Article V (other than Section 5.3(c)), the Company shall be entitled to a temporary restraining order and injunctive relief restraining the Executive from the commission of any breach, and to recover the Company's attorney's fees, costs and expenses related to the breach.

In paragraph 19, Highland alleged Daugherty breached the confidentiality provisions of the buy-sell agreement, and stated, "Any violation of the Buy-Sell Agreement's confidentiality provision allows Highland the same remedies described above, including injunctive relief, attorneys' fees, costs and expenses, and also requires Daugherty to forfeit his partnership interest." Paragraphs 17 and 19 were included under section IV of the petition, entitled "Factual Background."

In section VI, its breach of contract claim, Highland first incorporated "the allegations contained in all preceding paragraphs as if fully set forth herein" in paragraph 26. In paragraphs 27 and 28, Highland alleged that "[t]he foregoing acts and omissions of Daugherty constitute material breaches of his contractual obligations" under the employment agreement and the buy-sell agreement. In paragraph 30, Highland alleged:

> 30. As a direct and proximate result of Daugherty's breach of the Employment Agreement and the Buy-Sell Agreement, Highland has suffered and will suffer damages, and has been forced to incur attorney's fees and costs, for which it seeks recovery herein.

Daugherty relies on section XIV of Highland's petition, however, to argue that Highland's specific pleading for fees under Chapter 38 of the civil practice and remedies code precludes recovery of contractual attorney's fees. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001–38.006 (West 2015) (Attorney's Fees). Daugherty argues that Highland made a specific claim for attorney's fees under section 38.001(8), which provides for recovery of attorney's fees for breach of an oral or written contract. *See id.* § 38.001(8). Daugherty concludes the jury's finding of zero damages precludes any recovery of attorney's fees under Chapter 38. *See MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 666 (Tex. 2009) (to recover fees under Chapter 38, litigant must both prevail on a breach of contract claim and recover damages).

In section XIV of its petition, Highland alleged:

XIV.
ATTORNEY'S FEES

> 66. Plaintiffs hereby incorporate the allegations contained in all preceding paragraphs as if fully set forth herein.

> 67. Plaintiffs have retained the undersigned law firm to prosecute its claim for breach of contract. Therefore, Plaintiffs seek to recover its [sic] reasonable and necessary attorneys' fees incurred in the prosecution of this action pursuant to Tex. Civ. Prac. & Rem. Code § 38.001 and any other

–4–

applicable law. Plaintiffs further seek pre-judgment and post-judgment interest as allowed by law.

Relying on this Court's opinion in *Kreighbaum v. Lester*, No. 05-06-01333-CV, 2007 WL 1829729, at *2 (Tex. App.—Dallas June 27, 2007, no pet.) (mem. op.), Daugherty argues Highland pleaded for attorney's fees only under Chapter 38. In *Kreighbaum*, we explained that "[i]f a party pleads generally and then goes further and pleads specifically on the same subject, the specific allegations control. The pleader cannot rely on the general allegations but is confined to the specific allegations." *Id.* Daugherty argues Highland's specific allegations in section XIV control, rather than the "general allegations" in section VI.

In *Kreighbaum*, the plaintiff sued the defendants for breach of contract, fraud, and violations of the DTPA. *Id.* at *1. In a counterclaim, the defendants alleged the plaintiff's DTPA claims were groundless, and they were therefore entitled to receive their attorney's fees under the DTPA. *Id.* During trial, the plaintiff nonsuited his contract claim, and the jury found for defendants on the remaining claims. *Id.* After trial, as the parties had agreed, the issue of attorney's fees was submitted to the court. *Id.* Defendants' motion for fees, however, was premised on the parties' contract and not on the DTPA as defendants had pleaded in their counterclaim. *Id.* Although the trial court granted defendants leave to amend their pleading, they did not do so. *Id.* The trial court denied the defendants any recovery of attorney's fees, and we affirmed, concluding that the defendants were limited to the specific ground for recovery of fees that they had pleaded. *Id.* at *3. We explained that although the defendants' prayer for relief contained a "nonspecific request for attorney's fees," their counterclaim "specifically sets forth the basis for the request for attorney's fees, section 17.50(c) of the business and commerce code." *Id.*

We explained that Texas follows a "fair notice" standard of pleading, "meaning we look to whether the opposing party can ascertain from the pleading the nature and basic issues of the

controversy and what testimony will be relevant." *Id.* at *2 (citing *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896 (Tex. 2000)). We also explained,

> A petition is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases his claim. The purpose of this rule is to give the opposing party information sufficient to enable him to prepare a defense. The test of fair notice is whether an opposing party of reasonable competence, with the pleadings before him, can ascertain the nature and the basic issues of the controversy and the testimony probably relevant.

*Id.* (quotation marks and citations omitted). We stated, "[a]n opposing attorney of reasonable competence regarding appellants' pleading would conclude the request for attorney's fees in the prayer was based on the statement in the counterclaim that appellants are entitled to attorney's fees pursuant to section 17.50(c) of the business and commerce code." *Id.* at *3. We concluded,

> Because the pleading *does not mention* entitlement to attorney's fees under the contract, an opposing attorney of reasonable competence would not interpret the pleading as seeking attorney's fees under the contract. Because appellants specifically pleaded for attorney's fees under section 17.50(c) and *did not plead for attorney's fees under the contract*, appellants are limited to recovery of attorney's fees under section 17.50(c) and are not entitled to recovery of fees under the contract.

*Id.* (emphasis added).

In contrast to defendants' pleading in *Kreighbaum*, Highland's petition not only "mentions" Highland's entitlement to attorney's fees under two specific contracts, but also quotes the specific contractual provision and attaches a copy of the contract to the petition. Although the quote is in the factual background section of the pleading and the contract is an attachment, our pleading rules allow statements in a pleading to be "adopted by reference in a different part of the same pleading." TEX. R. CIV. P. 58. Our pleading rules also allow alternative claims for relief. TEX. R. CIV. P. 48. In its breach of contract count, Highland specifically alleged it "has been forced to incur attorney's fees and costs, for which it seeks recovery herein." An "attorney of reasonable competence with the pleadings before him" could ascertain that Highland's claim for breach of the two contracts included a claim for its attorney's

fees as the contracts provided. The attorney reading the petition could also review the specific contractual language under which the claim was asserted. And although section XIV specified that Highland sought attorney's fees under section 38.001, that same paragraph also asserted a claim to fees under "any other applicable law," not limiting its claim to section 38.001.

We conclude that Highland's claim for attorney's fees under the two contracts was sufficiently pleaded to meet the fair notice standards of our rules. *See* TEX. R. CIV. P. 47(a) (pleading shall contain "a short statement of the cause of action sufficient to give fair notice of the claim involved").[2]

### B.    Failure to tender a jury question

Daugherty also contends that Highland was not entitled to recover its attorney's fees because it did not tender a substantially correct jury question. The jury found Highland's reasonable and necessary attorney's fees to be $2.8 million in response to Question 6 of the jury charge. The jury was instructed to answer Question 6 if it answered Question 5, which inquired about the amount of Highland's damages. The jury answered Question 6 even though it answered "0" to Question 5. Daugherty contends that the predicate limited Question 6 to an award of attorney's fees under Chapter 38, because under the contracts, a finding of actual damages was not required in order to recover attorney's fees. But we may only reverse a judgment for charge error if the error probably caused the rendition of an improper judgment or probably prevented Daugherty from properly presenting the case to the appellate courts. TEX. R. APP. P. 44.1; *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012). We have concluded that Highland pleaded for its attorney's fees under its contracts. Highland also offered evidence of its fees and obtained a jury finding of the amount. The trial court rendered judgment for the amount

---

[2] Because of this conclusion we need not address Highland's contention that the permanent injunction entered by the trial court supports an award of attorney's fees under Chapter 38 even without actual damages. *See* TEX. R. APP. P. 47.1.

found by the jury. We conclude that any error regarding the predicating instruction did not cause the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1; *Thota*, 366 S.W.3d at 687.

We conclude the trial court did not err in awarding Highland its attorney's fees. We decide Daugherty's first issue against him.

## II.     Injunction against Daugherty

### A.     Background

In his second issue Daugherty argues that the trial court abused its discretion in granting a permanent injunction against him from "retaining, using, disclosing, publishing or disseminating" Highland's "confidential, proprietary, and/or privileged information."[3] We review the trial court's issuance of injunctive relief for abuse of discretion. *Leibovitz v. Sequoia Real Estate Holdings, L.P.*, 465 S.W.3d 331, 350–51 (Tex. App.—Dallas 2015, no pet.).

Both the buy-sell and employment agreements contained confidentiality provisions. In each contract, Daugherty agreed that a violation of the confidentiality provisions would result in irreparable injury to Highland. In each contract, Daugherty also agreed that if he breached the confidentiality provisions, Highland would be entitled to injunctive relief. Highland's "sole" remedy for breach, however, was the relief stated in each contract. Highland argues these provisions alone suffice to support the trial court's injunction. Daugherty responds that under the provisions, Highland "was still required to prove its entitlement to injunctive relief by probative evidence demonstrating the standard requirements for that relief." He urges that in any

---

[3] Specifically, the judgment states:

> It is therefore further ORDERED that Daugherty be and hereby is commanded to cease and desist from retaining, using, disclosing, publishing or disseminating Highland's (or its affiliates') confidential, proprietary, and/or privileged information, including but not limited to information concerning Highland's customers, clients, marketing, business and operational methods, contracts, financial data, technical data, e-mail, pricing, management methods, finances, strategies, systems, research, plans, reports, recommendations and conclusions, tear sheets, industry comparative analysis, Collateralized Loan Obligation (CLO) and other structured products, and names, arrangements with, or other information relating to Highland's (or its affiliates') customers, clients, suppliers, financiers, owners, and business prospects. Notwithstanding the foregoing, Daugherty may use or disclose the information described in this paragraph only as (i) required by law; or (ii) directed and authorized in writing by Highland.

–8–

event, Highland abandoned these provisions by seeking damages "that it had contractually waived."

Several of the jury's findings are relevant to this issue. Question 1 inquired whether Daugherty failed to comply with the employment agreement or the buy-sell agreement. The jury was instructed that Daugherty failed to comply with either agreement if he used or disclosed Highland's confidential information or failed to return confidential information or other property belonging to Highland at the conclusion of his employment. The jury answered that Daugherty failed to comply:

> Answer "Yes" or "No" for each of the following:
>
> a. Employment Agreement: Confidential Information   yes
> b. Employment Agreement: Other Property   yes
> c. Buy-Sell Agreement   yes

In response to Question 2, the jury found Daugherty's failures to comply were not excused. In response to Question 5, the jury found "0" for Highland's lost profits[4] from Daugherty's failures to comply. In response to Question 9, the jury found Daugherty failed to comply with his fiduciary duty to Highland. In response to Question 10, the jury found Daugherty did not misappropriate any trade secrets from Highland, and in response to Question 11, the jury found Daugherty did not disparage Highland's business. Neither party challenges these findings. Unchallenged jury findings are binding on the appellate court. *See Carbona v. CH Med., Inc.*, 266 S.W.3d 675, 687 (Tex. App.—Dallas 2006, no pet.).

To obtain a permanent injunction, a party must show (1) a wrongful act; (2) imminent harm; (3) irreparable injury; and (4) no adequate remedy at law. *See Leibovitz*, 465 S.W.3d at 350. Daugherty contends there is no evidence to support the trial court's findings on the second, third, and fourth elements. He also contends the trial court "misapplied or misinterpreted the

---

[4] The jury was instructed to consider only lost profits in determining Highland's damages.

legal standard for what constitutes" these elements. Highland responds that there is sufficient evidence of the three elements, but also argues that Daugherty expressly agreed Highland could obtain injunctive relief so that no additional proof was necessary.

### B. Imminent harm

Imminent harm is established by showing that the defendant will engage in the activity sought to be enjoined. *Schmidt v. Richardson*, 420 S.W.3d 442, 447 (Tex. App.—Dallas 2014, no pet.). Highland introduced evidence that Daugherty had "extensive access to virtually all of Highland's confidential information" in his position as a Highland partner and senior executive. When Daugherty resigned, he forwarded Highland documents to his personal email address. He kept printouts of other emails, and had some 40,000 documents on his laptop. He has not returned these documents to Highland. There was evidence Daugherty divulged confidential information to the press. Daugherty did not return the information in response to two cease and desist letters from Highland or at any time during the pendency of the lawsuit. Daugherty has started a competing business. Highland's expert Adam Warren testified that the documents on Daugherty's laptop included four categories of confidential information, including portfolio and pricing information and documents regarding Highland's internal management and operations. Although the jury found that this information did not meet the definition of a "trade secret,"[5] and that Daugherty did not disparage Highland's business, the jury did find that Daugherty had used or disclosed "Confidential Information," as the term was defined in Daugherty's employment contract and as described by Warren and other witnesses.

After trial Daugherty's counsel notified the trial court by letter that Daugherty's laptop and iPad had been transferred to a third party for deletion of documents relating to Highland, and

---

[5] In Question 10, the jury was instructed that a "trade secret" is "any formula, pattern, device, information, or combination of any of the foregoing that is used in a business and that gives the owner an opportunity to obtain an advantage over his competitors who do not know or use it."

–10–

Daugherty had destroyed all hard copies of any Highland documents in his possession.[6] But these actions were not taken until after the jury had rendered its verdict. The trial court could consider Daugherty's conduct before and during trial in making its consideration of imminent harm:

> In making its determination of imminent harm, the trial court may determine that, when violations are shown up to or near the date of trial, the defendant has engaged in a course of conduct and the court may assume that it will continue, absent clear proof to the contrary. [*State v.*] *Texas Pet Foods,* 591 S.W.2d [800] at 804 [(Tex. 1979)]. The probability of the continuation of the prohibited practices is not subject to direct proof, and injunctive relief is proper when the trial court finds it justified under the rules of equity, notwithstanding a defendant's cessation of the activity or promise to cease the activity. *Id.*

*Operation Rescue-Nat'l v. Planned Parenthood of Houston & Se. Tex., Inc.*, 937 S.W.2d 60, 77 (Tex. App.—Houston [14th Dist.] 1996), *aff'd as modified*, 975 S.W.2d 546 (Tex. 1998). The trial court could consider Daugherty's course of conduct, as well as the jury's finding that Daugherty had used or disclosed Highland's confidential information in violation of his agreements with Highland, in determining that Highland showed imminent harm. *See id.*

Daugherty contends the jury's finding of zero damages for breach of the contracts' confidentiality provisions precludes a finding of imminent harm. He argues that the jury's finding foreclosed the existence of substantial and actual injury that is required to prove imminent harm, citing *Frey v. DeCordova Bend Estates Owners Association*, 647 S.W.2d 246, 248 (Tex. 1983). In *Frey*, Frey sought to enjoin the "possible" assessment and collection of certain fees by a subdivision association from owners of property, even though he had taken no action by which he could potentially incur the fees. *See id.* at 247 ("Frey is currently under no obligation to incur any such fees."). The fees in question were for permits to build a house or to

---

[6] Daugherty also contends that the trial court's "conjecture" that Daugherty might again gain access to the documents "caused very real harm to Daugherty in the form of a judgment for $2.8 million in attorney's fees, which the judge stated were permissible only because of his entry of the injunction." But we have concluded that the award of attorney's fees was based on pleading and proof of a breach of contract, as we have discussed, so that the award of attorney's fees did not rest solely on the injuction.

–11–

transfer or lease a lot, and the supreme court agreed with Frey that the fees were not permitted under the covenants and bylaws of the association. *Id.* at 247–48. Nonetheless, Frey was not entitled to injunctive relief. *Id.* at 248. The court explained, "[t]he record reflects no attempt or even intent by Frey to build upon, sell or lease his lot; nor is there a showing that the Association intends to assess a fee against Frey." *Id.* at 248. The court concluded "[t]he mere invalidity of the contested fees does not constitute a substantial injury or threat of imminent harm to Frey; therefore, he did not show that he was entitled to injunctive relief." *Id.* The supreme court later described its holding in *Frey* as "the fear or apprehension of the possibility of injury is not a basis for injunctive relief," in support of its statement that "[a]n injunction will not issue unless it is shown that the respondent will engage in the activity enjoined." *State v. Morales*, 869 S.W.2d 941, 946–47 (Tex. 1994). Here, the focus is on whether Highland has shown that Daugherty will engage in the activity enjoined. *See id.* Given the evidence that Daugherty took, kept, and used confidential information, in breach of his contracts, after demands and protracted litigation to return it, Highland established more than "fear or apprehension of the possibility of injury," notwithstanding the jury's zero finding of lost profits.

In addition, although the damages question was limited to lost profits,[7] there was evidence of other injury to Highland from Daugherty's actions. For example, Highland's expert Warren testified there was harm from Daugherty's breach he could not quantify:

> Q. Has Highland been harmed now that this information is no longer within the confines of Highland?
>
> A. I believe so, yes.
>
> Q. And tell me just generally in what way?

---

[7] Highland proffered evidence of expenses it incurred in a related investigation, but the trial court did not allow a jury question on that measure of damages because Highland did not offer proof of the reasonableness and necessity of the expenses.

–12–

A. I believe Highland has been harmed because this information goes to the core of what Highland does as a business and what Highland is in terms of its value. And having this information out of Highland's control is not just potentially harmful, but its existence away from Highland harms Highland because there's always the possibility that it can get into general distribution.

Q. Or to a competitor?

A. Or to a competitor.

Q. Can you quantify that harm?

A. I cannot quantify the total harm and there's a couple of reasons why. First reason is the harm may occur at—may not be immediate, but the harm may occur over a long period of time and—and may be, perhaps, unknowable or directly tied to these specific documents. It doesn't mean there hasn't been harm, but it may be that I can't measure the specific relationship of these documents to that harm. Additionally, we can't figure out how much harm there is. The harm could be enormous, but again, you can't measure things like—you can't measure things that you don't know have occurred. So to find a true quantitative way to measure this harm I think is almost impossible, but that doesn't say that Highland has not been harmed significantly.

Q. Did—did you perform any sort of statistical analysis to try to put a number to this harm that you're describing?

A. We did not and could not.

We also discuss other evidence Highland proffered to prove its "substantial and actual injury or threat of imminent harm" below. *See Frey*, 647 S.W.2d at 248.

Highland offered evidence that it had been harmed by Daugherty's actions, although the harm was not fully quantified. After review of the evidence and the jury's findings, we conclude that the trial court was within its discretion to find that Daugherty "will engage in the activity sought to be enjoined," establishing the element of imminent harm. *See Schmidt*, 420 S.W.3d at 447.

–13–

## C.    Irreparable injury and adequate legal remedy

An injury is irreparable if the injured party cannot be compensated in damages or if the damages cannot be measured by any certain monetary standard. *Leibovitz*, 465 S.W.3d at 352 (citing *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002)). "An existing legal remedy is adequate if it is as complete, practical, and efficient to the ends of justice and its prompt administration as is equitable relief." *Id.* at 353.

Daugherty argues that because Highland sought damages for Daugherty's breach of the confidentiality provisions, any injury was not irreparable and could be compensated in damages, even though the jury's finding was zero. Daugherty also points to Highland's unsuccessful attempt to introduce evidence of $625,000 in expenses related to an investigation it undertook. He argues that even though the evidence was excluded, Highland's effort to recover a specific dollar amount established that Highland could be compensated in damages for any injury it suffered from Daugherty's breaches. He also contends that when Highland sought money damages, it waived his written agreement that violations of the confidentiality provisions "would result in irreparable injury." But Highland also introduced evidence of harm that could not be quantified. For example, Warren testified that a specific document Daugherty took and failed to return revealed Highland's current and prospective investment strategies, and "should this get out of the firm, it could potentially tell competitors what is Highland Capital going to do in . . . these specific securities." The document also contained "prospective strategies" that revealed "what assets Highland is looking at and what does Highland intend to do going forward."

In addition to Warren's testimony, Mark Okada, one of the co-founders of Highland, testified:

> Q. (By Mr. Katz) Mr. Okada, could you describe the type of harm that Highland would suffer if its confidential and proprietary information gets out in public?

–14–

[objection and ruling omitted]

A. It's very difficult to. I mean, this is about your obligations and the trust that you have with your clients. And it's also about from a regulatory standpoint what you've agreed to do with people that govern you. So putting a dollar value is almost impossible. But it's very valuable to us. It's very, very important.

Thomas Surgent, Highland's chief compliance officer and general counsel, testified about a particular document Daugherty failed to return in which one of Highland's investors was identified as well as "names of our other clients and the investment objectives which are confidential":

Q. What's the risk of harm to Highland with these types of documents being out in public?

A. Risks are several. Specifically, some of the people in the marketplace can replicate our firm strategies and our investment objectives and form competing funds with these materials like marketing materials, et cetera. They could potentially market to these investors and take investment opportunities away from our investors. Then it gets back to . . . how our investors trust us to maintain the confidentiality of their information.

If our investors see that we don't have enough safeguards over our confidential information, that our confidential information could merely be leaked into the marketplace, if people can identify who they are and what private funds they are investing in, they would refuse to invest with us. We would be violating our agreements with them. We would be violating the law.

Regarding another document Daugherty took and failed to return, Surgent testified:

Q. Does Highland consider [offering documents] confidential?

A. Those would be among the most critical of our documents. If those documents were to leak out our other competitors could literally replicate our funds verbatim by simply changing the names and going and marketing it in the marketplace, could decimate our competitor advantage.

As we explained in *Leibovitz*, "'assigning a dollar amount to such intangibles as a company's loss of clientele, goodwill, marketing techniques, and office stability, among others, is not easy.'" *Leibovitz*, 465 S.W.3d at 352 (quoting *Frequent Flyer Depot, Inc. v. Am. Airlines,*

–15–

*Inc.,* 281 S.W.3d 215, 228 (Tex. App.—Fort Worth 2009, pet. denied)). The trial court could determine from the evidence that injury to Highland from dissemination of its confidential information could not be compensated by damages or could not "be measured by any certain monetary standard." *See id.* We conclude as in *Leibovitz* that there was legally and factually sufficient evidence of imminent harm, irreparable injury, and lack of adequate legal remedy to support the trial court's grant of a permanent injunction. *See id.* We decide Daugherty's second issue against him.

### HIGHLAND'S APPEAL

In its cross-issue Highland challenges the jury's finding of $0 for its appellate attorney's fees. Highland contends that to support a $0 award, the evidence must affirmatively show that no legal fees were necessary or that those provided had no value. *See Midland W. Bldg. L.L.C. v. First Serv. Air Conditioning Contractors, Inc.*, 300 S.W.3d 738, 739 (Tex. 2009) (per curiam). Highland argues there was no such evidence here, and contends that the only remedy is to sever its claim for fees and remand for a new trial on that issue.

Highland concedes, however, that it did not raise this objection in the trial court. Highland recognizes our cases holding that a legal sufficiency point must be raised by a motion for instructed verdict, motion for judgment notwithstanding the verdict, objection to a jury question, motion to disregard a jury finding, or motion for new trial. *See, e.g., Grocers Supply, Inc. v. Cabello*, 390 S.W.3d 707, 725 (Tex. App.—Dallas 2012, no pet.). Highland urges us, however, to make an exception for challenges to jury findings of $0 for attorney's fees. Highland argues that such a challenge may only be made by a motion for new trial,[8] but rule 324

---

[8] Highland relies on *Smith v. Patrick W.Y. Tam Trust*, 296 S.W.3d 545, 548–49 (Tex. 2009), in asserting this argument. Daugherty disagrees with Highland's interpretation of the case. Our conclusion that Highland was required to bring its objection in some form to the trial court's attention makes discussion of these arguments unnecessary.

does not require a motion for new trial for no-evidence objections. *See* TEX. R. CIV. P. 324(a), (b) (addressing when motion for new trial required).

Whether "by a timely request, objection, or motion," the trial court must be made "aware of the complaint" as a prerequisite to appeal. TEX. R. APP. P. 33.1(a) (preservation of appellate complaints). Highland was required to make its complaint in the trial court and obtain a ruling. *See id.* Because it did not, it did not preserve its complaint for appellate review. *Id.*

We decide Highland's first issue against it. Because of our disposition of Daugherty's issues, we need not address Highland's second issue complaining of the trial court's failure to grant leave to file a trial amendment to plead for attorney's fees under the parties' contracts.

**HERA'S APPEAL**

In five issues, HERA complains of the trial court's judgment awarding $2.6 million to Daugherty for HERA's breach of an implied covenant of good faith and fair dealing. HERA argues the evidence is legally and factually insufficient to support the jury's finding; an essential element of Daugherty's cause of action was omitted from the jury instructions; and there were errors in the damages award. For the reasons we discuss, we decide these issues against HERA.

## I. Background

HERA, a limited liability company, was created in 2009 by Highland, its sole member. HERA was formed under, and is governed by, Delaware law. According to Highland's chief compliance officer and general counsel Thomas Surgent, Highland's purpose in creating HERA was "to establish a plan to incentivize employees to stay with Highland." As Surgent explained to the jury, "Highland took assets that were Highland's assets and gifted them, transferred them for no consideration, put them in this new entity called HERA and then gave certain employees, key employees of Highland the potential right to share in distributions from those assets provided they remained employed with Highland for a period of time." Surgent testified that at the outset

–17–

there were approximately 39 unit holders in HERA. Daugherty was a member of HERA's initial board of directors and was awarded "Series A Preferred" units in HERA at HERA's creation. His initial units vested on May 15, 2011. As the largest unit holder in HERA, Daugherty received approximately $1.5 million in distributions from HERA throughout his employment with Highland. At the time of his resignation from Highland, Daugherty had accumulated over 1900 units in HERA.

To resolve HERA's issues we must examine the express terms of the "Limited Liability Company Agreement" creating HERA in 2009. Highland and HERA agreed that HERA's purpose "shall be to receive and hold assets to be contributed by [Highland] and to distribute the proceeds of such assets from time to time to certain employees of [Highland] . . . as the Board may from time to time determine in order to create a retention initiative for such employees and to engage in such other lawful purposes and activities in connection with the foregoing." HERA was granted powers to conduct its business in accordance with its purpose. HERA's board of directors was granted "exclusive and complete authority" to operate the company, but certain specified actions could not be taken without "the prior affirmative vote or written consent of at least 75% of the members of the Board." One of these specified actions was the power to "amend, alter, change or repeal any of the provisions of this Agreement." Exhibit A to the agreement, entitled "Rights of Common Unit and Series A Preferred Units," provided that the "Restricted Series A Units" such as those received by Daugherty "shall vest and become non-forfeitable on May 15, 2011." A "Termination of Employment" provision in Exhibit A addressed only terminations prior to the vesting date. Exhibit A also addressed "Dividend Rights," providing, "The Board may elect from time to time to make distributions, in cash or in kind, to the holders of the Series A Preferred Units, provided that (i) all such distributions shall be paid pro rata to each holder of Series A Preferred Units . . . ."

–18–

Daugherty's claims against HERA arise from a provision added to the HERA agreement in a 2012 amendment. Entitled "Section 12.1 Dispute Resolution" in HERA's "Second Amended and Restated Limited Liability Agreement," the provision allowed HERA's board to suspend and place in escrow all pending and future distributions to a "Disputing Party" who had made a claim against HERA "that in any way does or could adversely impact" any of HERA's assets. Once the dispute was resolved, Section 12.1 gave HERA's board discretion to make two deductions from the escrowed funds before distributing them to the Disputing Party:

> The full balance of the Dispute Escrow shall be distributed to the Disputing Party promptly following the Dispute Resolution Date, net of the sum of (A) the full costs and expenses incurred by any Company Party[9] in connection with such Dispute, including without limitation, costs and expenses of legal counsel, unless a court of competent jurisdiction has ruled in favor or Disputing Party in a final non-appealable judgment, and (B) any diminution in value to the assets held by the Company resulting from or in connection with such Dispute, as determined by the Board in its sole discretion. Any amount deducted from a Disputing Party's distribution pursuant to the preceding sentence shall be reallocated pro rata to the other Series A Preferred Unit Holders based on their respective holdings of Series A Preferred Units.

In sum, under subsection (A) of Section 12.1 ("Part A"), HERA could deduct attorney's fees and costs from the escrowed funds if it prevailed in the dispute. Under subsection (B) ("Part B"), regardless of whether or not it prevailed in the dispute, HERA in its "sole discretion" could deduct an unspecified amount from the escrowed funds for "diminution in value" to HERA's assets "resulting from or in connection with" the dispute.

HERA's amended agreement that included Section 12.1 was unanimously adopted by HERA's board on February 16, 2012, after Daugherty had resigned his position with Highland. In his third-party action against HERA, Daugherty alleged that although there was no express agreement of the parties prohibiting the adoption of a dispute resolution provision, HERA

_____

[9] "Company Party" is defined earlier in Section 12.1 as HERA or "any Member thereof, any officer or director or other agent or representative or equity holder thereof."

breached the implied covenant of good faith and fair dealing by amending the agreement to add Section 12.1. At trial, Daugherty testified that the provision "chills and effectively reduces the value of my interest" in HERA "because it makes it that much more difficult for me to actually collect on it."

At trial, several witnesses including Daugherty himself testified that a provision such as Part A, to protect the interests of HERA's unit holders in the event of a claim against HERA, was not objectionable in principle. Daugherty focuses on Part B, however, to argue that HERA enacted Section 12.1 in bad faith in order to deprive him of his interest. Daugherty's current business partner, also a former Highland employee, testified that Highland's president and owner James Dondero told him the purpose of amending the HERA agreement was to "take value away that had been earned" by Daugherty.

Daugherty also offered evidence that during the course of this litigation, Highland purchased the interests of all other unit holders in HERA for the value of their shares minus an overall discount of approximately 25%. Highland's offer to Daugherty for his HERA interest, however, was "$0" because "Purchaser has determined that the costs, expenses and diminution of the assets (including goodwill) . . . exceed the value of Participant's [units]." Daugherty offered expert testimony of the fair market value of his interest in HERA on three specific dates, including a value of $2.6 million as of December 31, 2012, when Highland offered to purchase the interests of HERA's other unit holders.

Daugherty's breach of contract claim against HERA was submitted to the jury in Question 17 of the jury charge. We quote Question 17 in full because it is the focus of our analysis of HERA's issues:

**QUESTION NO. 17**

Did HERA fail to comply with the HERA Agreement?

HERA failed to comply with the HERA Agreement by amending the HERA Agreement to include Section 12.1 of the Second Amended HERA Agreement if the Second Amended HERA Agreement divested Daugherty's Series A Preferred Units.

HERA failed to comply with the HERA Agreement if it failed to comply with the implied covenant of good faith and fair dealing by amending the HERA Agreement to include Section 12.1 of the Second Amended HERA Agreement.

Do not consider any actions taken by HERA after February 16, 2012, when the Second Amended and Restated Limited Liability Company Agreement of HERA was adopted when determining if HERA failed to comply with the HERA Agreement.

Every contract contains implied covenants from the parties of good faith and fair dealing. In determining whether a party is acted [sic] in good faith and fair dealing, you must consider what the parties would have agreed to themselves had they considered the issue in their original bargaining positions at the time of contracting. In other words, is it clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith and fair dealing—had they thought to negotiate with respect to that matter.

"Good faith" means faithfulness to the scope, purpose, and terms of the parties' contract. "Fair dealing" means a commitment to deal "fairly" in the sense of consistently with the terms of the parties' agreement and its purpose.

An implied covenant of good faith and fair dealing requires that a party refrain from arbitrary and unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of his bargain. When exercising a discretionary right, a party to the contract must exercise its discretion reasonably.

Answer "Yes" or "No" for each of the following.

|  | **Divesting by Section 12.1** | **Implied Covenant of Good Faith and Fair Dealing by Section 12.1** |
|---|---|---|
| HERA | NO | YES |

Because the jury answered part of Question 17 "yes," it proceeded to Question 18, finding that $2.6 million, the "fair market value of Daugherty's HERA units," would fairly and reasonably compensate Daugherty for the breach. Based on this answer, the judgment orders "that Daugherty have and recover $2,600,000 from HERA."

## II.    Standards of review

Because HERA is attacking the legal sufficiency of the evidence supporting an adverse finding on an issue for which it did not have the burden of proof, HERA must demonstrate that there is no evidence to support the adverse finding. *See Exxon Corp. v. Emerald Oil & Gas Co.,* 348 S.W.3d 194, 215 (Tex. 2011). We will sustain a no-evidence challenge on appeal if the record shows (1) a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *Serv. Corp. Int'l v. Guerra,* 348 S.W.3d 221, 228 (Tex. 2011). "Evidence is legally sufficient if it 'would enable reasonable and fair-minded people to reach the verdict under review.'" *Exxon Corp.,* 348 S.W.3d at 215 (quoting *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex. 2005)). In conducting our review, we examine the evidence in the light most favorable to the jury's verdict. *City of Keller,* 168 S.W.3d at 822. We must assume that the jury resolved conflicting evidence and made reasonable inferences from the evidence in favor of the prevailing party. *Id.* at 821.

HERA also challenges the factual sufficiency of the evidence to support the jury's adverse finding. In response to this challenge, we will set aside the verdict only if the evidence that supports the jury finding is so weak as to make the verdict clearly wrong and manifestly unjust. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986) (per curiam). The appellate court may

not substitute its judgment for that of the trier of fact or pass on the credibility of the witnesses. *See Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex. 1998).

HERA also challenges the trial court's refusal to submit a requested jury instruction. We review this ruling for abuse of discretion. *Thota*, 366 S.W.3d at 687. An instruction is proper if it assists the jury, accurately states the law, and finds support in the pleadings and evidence. *Id*. But even if we conclude the trial court's decision was erroneous, we may not reverse the trial court's judgment unless the error was harmful. *Id*. An error is harmful if it probably caused an improper judgment or probably prevented the appellant from properly presenting the case to the court of appeals. TEX. R. CIV. P. 44.1(a); *Thota*, 366 S.W.3d at 687. "Charge error is generally considered harmful if it relates to a contested, critical issue." *Thota*, 366 S.W.3d at 687. To determine whether the error was harmful, we examine the entire record. *Id*. at 686–87; *Transcontinental Ins. Co. v. Crump*, 330 S.W.3d 211, 225 (Tex. 2010).

## III. Applicable law

### A. Delaware

The 2009 HERA agreement provides that it is "governed by and construed in accordance with" Delaware law. The parties agree that Delaware law applies. The implied covenant of good faith and fair dealing attaches to every Delaware contract. *See Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441–42 (Del. 2005). "The covenant is best understood as a way of implying terms in the agreement, whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions." *Id.* at 441 (internal quotations and footnotes omitted). "[T]he implied covenant requires 'a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from

receiving the fruits' of the bargain." *Id.* (quoting *Wilgus v. Salt Pond Inv. Co.*, 498 A.2d 151, 159 (Del. Ch. 1985)).[10]

But "existing contract terms control." *Id.* "Applying the implied covenant is a 'cautious enterprise' and we will only infer 'contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated.'" *Gerber v. Enterprise Prods. Holdings, LLC*, 67 A.3d 400, 421 (Del. 2013) (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010)).[11] General allegations of bad faith conduct are not sufficient to state a claim for breach of the implied covenant. *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009). A plaintiff must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage by the plaintiff. *Id.* (citations omitted). The plaintiff must allege how the violation of a specific implied contractual obligation denied the plaintiff the fruits of the contract. *Id.* "'Good faith' does not envision loyalty to the contractual counterparty, but rather faithfulness to the scope, purpose and terms of the parties' contract." *Gerber*, 67 A.3d at 421. What is arbitrary and unreasonable "depends on the parties' original contractual expectations, not a 'free-floating' duty applied at the time of the wrong." *Id.*

An implied covenant claim "looks to the past," to the parties' original bargain. *See id.* at 418. The claim "does not ask what duty the law should impose on the parties given their relationship at the time of the wrong, but what the parties would have agreed to themselves had they considered the issue in their original bargaining positions at the time of contracting." *Id.* The question to be answered in the analysis is a "what if" question: "whether it is clear from

[10] *Wilgus* was superseded by statute on other grounds, as recognized in *DeSabatino v. Salicete*, 695 A.2d 1118 (Del. 1997).

[11] *Gerber* was overruled on other grounds. *Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 815 n.13 (Del. 2013) (regarding standard for filing cross appeal). The supreme court has since continued to rely on *Gerber*'s explanation of the implied covenant of good faith and fair dealing under Delaware law, however. *See Blaustein v. Lord Baltimore Capital Corp.*, 84 A.3d 954, 959 n. 24 (Del. 2014) (quoting and citing *Gerber*).

The *Gerber* court quotes extensively from the Delaware Court of Chancery's opinion in *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 50 A.3d 434, 440–42 (Del. Ch. 2012), *aff'd in part, rev'd in part on other grounds*, 68 A.3d 665 (Del. 2013), adopting "this well-reasoned analysis as a correct statement of our law." *Gerber*, 67 A.3d at 418. We omit the citations to *ASB Allegiance Real Estate Fund* in our quotations from *Gerber*.

what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith—had they thought to negotiate with respect to that matter." *Id.* ("While this test requires resort to a counterfactual world—what if—it is nevertheless appropriately restrictive and commonsensical."); *see also Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 816 (Del. 2013) (party may only invoke protections of implied covenant of good faith and fair dealing when it is clear from underlying contract that contracting parties would have agreed to proscribe act later complained of had they thought to negotiate the matter).

In their discussions of the implied covenant of good faith and fair dealing, Delaware courts include reference to "developments or contractual gaps that the asserting party pleads neither party anticipated." *See, e.g., Nemec*, 991 A.2d at 1125; *Gerber*, 67 A.3d at 421. In the "cautious enterprise" of applying the implied covenant, courts will "not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal." *Nemec*, 991 A.2d at 1126. As the Delaware supreme court explained, "[p]arties have a right to enter into good and bad contracts, the law enforces both." *Id.* Whether a party is attempting to "rewrite . . . a bad deal" is determined by examining the parties' "reasonable expectations at the time of contracting." *See id.* Where parties "simply failed to consider" a development that later adversely affected one party, the court will not rewrite their contract to rebalance their economic interests. *See Gerber*, 67 A.3d at 421; *Nemec*, 991 A.2d at 1126. But where the party asserting the implied covenant "proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected," the court will imply contract terms. *Nemec*, 991 A.2d at 1126. It is the frustration of these reasonable expectations, determined as of the time of the parties' original bargain, that distinguishes a breach of the implied covenant from the consequences of a bad deal.

Under Delaware law, a non-breaching party to a contract "is entitled to recover damages that arise naturally from the breach or that were reasonably foreseeable at the time the contract was made." *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146 (Del. 2009) (internal quotation omitted). Contract damages are designed to place the injured party in an action for breach of contract in the same place as he would have been if the contract had been performed, and should not act as a windfall. *Id.* The court in *Paul* also explained, "[e]xpectation damages are measured by the losses caused and gains prevented by defendant's breach." *Id.* at 146–47 (internal quotation omitted). Under Delaware law,

> [T]he standard remedy for breach of contract is based upon the reasonable expectations of the parties *ex ante*. This principle of expectation damages is measured by the amount of money that would put the promisee in the same position as if the promisor had performed the contract. Expectation damages thus require the breaching promisor to compensate the promisee for the promisee's reasonable expectation of the value of the breached contract, and, hence, what the promisee lost.

*Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1130 (Del. 2015) (quoting *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001)).

### B. Texas

Although Delaware law applies to interpretation of the parties' contract, we apply Texas law regarding submission of the charge to the jury. *See, e.g., Maxus Energy Corp. v. Occidental Chem. Corp.*, 244 S.W.3d 875, 878 (Tex. App.—Dallas 2008, pet. denied) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 71.031(b)). "The goal of the charge is to submit to the jury the issues for decision logically, simply, clearly, fairly, correctly, and completely." *Hyundai Motor Co. v. Rodriguez ex rel. Rodriguez*, 995 S.W.2d 661, 664 (Tex. 1999). A trial court has more discretion when submitting instructions to the jury than when submitting questions. *Curtis v. AGF Spring Creek/Coit II, Ltd.*, 410 S.W.3d 511, 514 (Tex. App.—Dallas 2013, no pet.). "If the charge resolves the controlling issues raised by the pleadings and any evidence in a feasible

manner that does not confuse the jury, no error occurs." *Ganesan v. Vallabhaneni*, 96 S.W.3d 345, 351 (Tex. App.—Austin 2002, pet. denied) (quoting *Connell Chevrolet Co. v. Leak,* 967 S.W.2d 888, 894 (Tex. App.—Austin 1998, no pet.)).  The jury "need not and should not be burdened with surplus instructions, even if they are proper statements of the law."  *Dallas Cnty. v. Holmes*, 62 S.W.3d 326, 332 (Tex. App.—Dallas 2001, no pet.).  If a trial court's charge fairly and fully presents all controlling issues to the jury, it is not error to refuse to submit additional issues or instructions that are mere shades or variations of the issues already submitted.  *See Johnson v. King*, 821 S.W.2d 425, 427 (Tex. App.—Fort Worth 1991, writ denied).  The trial court is accorded broad discretion as long as the charge is legally correct.  *Hyundai Motor Co.*, 995 S.W.2d at 664.

## IV.    Analysis

### A.    Implied covenant of good faith and fair dealing

HERA's first and second issues challenge the omission of an instruction from Question 17 and the evidence to support the jury's "Yes" answer to that question.  We address these issues together.

The question presented under Delaware law is whether the original 2009 HERA agreement included an implied covenant that the parties would not amend the agreement to include provisions such as Part A[12] or Part B of Section 12.1.  If it did, then HERA's enactment of Section 12.1 would be a breach of this covenant, and therefore a breach of the duty of good faith and fair dealing.  Delaware law requires examination of the parties' "original bargaining positions at the time of contracting."  *Gerber*, 67 A.3d at 418.

---

[12] Under Delaware law, "fee-shifting provisions in a non-stock corporation's bylaws can be valid and enforceable."  *ATP Tour, Inc. v. Deutscher Tennis Bund*, 91 A.3d 554, 555 (Del. 2014).  In *ATP Tour, Inc.*, the court explained that a fee-shifting bylaw is "facially valid," because no Delaware statute or principle of common law prohibits it.  *Id.* at 558.  But whether a fee-shifting bylaw is enforceable "depends on the manner in which it was adopted and the circumstances under which it was invoked."  *Id.*  If the bylaw was "adopted or used for an inequitable purpose," it is not enforceable.  *Id.*  "In sum," the court explained, "the enforceability of a facially valid bylaw may turn on the circumstances surrounding its adoption and use."  *Id.* at 559.

The parties' briefs include arguments regarding whether Daugherty's expectations are relevant to the analysis. Daugherty was an initial director and unit holder in HERA but not a named "party" to the HERA agreement. HERA thus argues that only HERA's and Highland's expectations are relevant, while Daugherty contends HERA waived any such argument by failing to object to the jury charge, and his expectations must be considered.

There is some evidence that a unit holder such as Daugherty, anticipating a future dispute, would have agreed to forbid a future amendment to add either Part A or Part B. Daugherty testified that he "wouldn't want there to be a free pass for the board to do whatever they want," explaining "somebody's got to keep them honest. Somebody's got to keep their interests in line with the investors, which I was one of them." Daugherty also testified he never anticipated a provision such as Part B: "And not in my wildest dreams would I think they would vote to give me nothing and take all the assets away and make them disappear." He continued:

> The second amendment [to the HERA agreement] basically makes it impossible for you to collect on your assets if they decide not to pay you. It's like, hey, we know we owe you something, but if you sue us to make us give it to you, then we're going to take it away, put it in an escrow account, and at the end of it, we may in our sole discretion subtract whatever amount we want even if you win. And I just thought that was patently unfair, completely unfair.

Assuming Daugherty was a party to the agreement, however, he was not the only party. The question presented under Delaware law is whether "the *parties* who negotiated express terms of the contract would have *agreed*" to the provision, and the jury charge here correspondingly inquired about "the parties" in plural. *See Gerber*, 67 A.3d at 418 (emphasis added). Daugherty's expectations alone are an insufficient basis for an implied covenant.

There is no evidence that a counterparty to the agreement such as HERA itself or Highland would have agreed to forbid an amendment to include Part A. There is, however, some

–28–

evidence that Part B was contrary to the intent and purpose of the original HERA agreement and would have been rejected even by a counterparty.

As discussed, we look to "what was expressly agreed upon" in the contract to determine what the parties would have agreed to themselves at the time of contracting. *See Gerber*, 67 A.3d at 418. There is nothing in the provisions of the original HERA agreement to indicate that in 2009, the parties would have forbidden a future amendment to add Part A, allowing shifting of litigation expenses with respect to a claim that could "adversely impact" HERA's assets, as long as at least 75% of HERA's board approved.[13] As one former HERA board member testified, the provision "gives HERA the ability to, for lack of a better term, protect the holders of HERA units in the event a holder takes an action that's adverse to the values of HERA, that could be adverse to the value of HERA, of the HERA units. And if I remember correctly, it lays out a mechanism to hopefully protect all parties involved until it's finally resolved, whatever it may be."

In contrast, Part B conflicts with HERA's stated purpose to "create a retention initiative" for employees who have been awarded an interest in HERA. No other purpose was expressly stated in the agreement, either originally or as amended. HERA was to accomplish this purpose by receiving and holding assets contributed by Highland "and distribut[ing] the proceeds of such assets from time to time" to those employees. Once vested, the employees' units would be "non-forfeitable." Distributions were to be made pro rata to "each holder." A unit holder, therefore, could reasonably expect to receive distributions according to his vested, non-forfeitable interest. Part B, however, allows HERA's board "in its sole discretion" to reduce the value of a unit holder's vested interest for "any diminution in value to the assets held by the Company resulting

---

[13] The 2012 second amended HERA agreement is signed by each member of HERA's board, and recites that "at least 75% of the Board of Directors of the Company has recommended certain amendments" to the agreement. In addition, Section 12.1 permits suspension and escrow of a disputing party's interest "with the consent of 75% of the Board."

from or in connection with" a unit holder's dispute. This broad authorization has no restrictions. Its application could result in reduction of a unit holder's interest to zero,[14] contrary to HERA's sole purpose. In sum, under Delaware law, the provision could permit HERA to engage in "arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *See Dunlap*, 878 A.2d at 441–42. Had the parties addressed the issue at the time of contracting, their reasonable expectations based on the language of the agreement do not indicate any intent to grant HERA unrestricted discretion to reduce a unit holder's vested and non-forfeitable interest. *See Gerber*, 67 A.3d at 422.

The original and amended HERA agreements, therefore, provide legally and factually sufficient evidence to support the jury's "Yes" answer to the "what if" question identified in *Gerber* and presented in Question 17 of the charge. *See Gerber*, 67 A.3d at 418 (court asks whether it is clear from express terms of contract that original negotiating parties would have agreed to proscribe the act later complained of as breach of implied covenant, had they thought to negotiate on that matter). The jury could have concluded from the agreements themselves that Part B conflicted with HERA's original and only purpose, and for that reason, even HERA or Highland "would have agreed to proscribe" such a provision "had they thought to negotiate with respect to that matter." *See id.*

HERA contends in the alternative that Question 17 was deficient because it failed "to require the jury to find that the adoption of an attorney's fee shifting provision could not be anticipated at the time the HERA agreement was executed." Citing *Nemec* and *Gerber* for the proposition that the implied covenant "only applies to developments that could not be anticipated," HERA argues there is no evidence that the parties in 2009 could not have

---

[14] At trial, Highland offered testimony that its zero offer to Daugherty was not an actual exercise of Section 12.1. Regardless of this evidence, Section 12.1 contains no restriction on the amount that can be deducted from a disputing unit holder's interest.

anticipated the subject of "a dispute between HERA and a member or a fee-shifting provision in the event of litigation."

HERA concludes that the trial court's instruction to the jury omitted an "essential element" of Daugherty's claim for breach of the implied duty of good faith and fair dealing under Delaware law. At trial, HERA objected to the charge on this basis. HERA now argues that this error probably caused an improper judgment because the only evidence offered at trial showed that fee-shifting provisions are common and could have been anticipated in the negotiation of a 2009 Delaware contract.[15] HERA further contends the trial court's error in refusing this instruction was harmful because it related to a critical contested issue. *See Thota*, 366 S.W.3d at 687.

HERA's argument is limited to whether the parties could have anticipated "a dispute between HERA and a member or a fee-shifting provision in the event of litigation," that is, Part A of Section 12.1. The argument fails for two reasons. First, it does not address whether the parties could have anticipated Part B. Second, the trial court's instruction correctly directed the jury to consider the controlling issue, whether it was "clear from what was expressly agreed upon" that the parties would have proscribed the addition of Part A or Part B "had they thought to negotiate with respect to that matter." *See Gerber*, 67 A.3d at 481; *Dunlap*, 878 A.2d at 442.

For Question 17, the trial court was required to formulate an instruction under Delaware law on an issue that, in Delaware, is not presented to a jury.[16] The trial court was "accorded broad discretion" in doing so, as long as the charge was legally correct. *Hyundai Motor Co.*, 995

---

[15] For example, Surgent testified that in his experience dispute resolution provisions are "typical" in Delaware contracts.

[16] Because issues such as application of an implied covenant of good faith and fair dealing are heard by Courts of Chancery in Delaware without juries, there are no pattern jury charges or Delaware cases discussing the proper submission of this issue to a jury. *See, e.g., Nat'l Indus. Grp. (Holding) v. Carlyle Inv. Mgmt., L.L.C.*, 67 A.3d 373, 382 (Del. 2013) (discussing jurisdiction of Chancery Courts); *see generally Kuroda*, 971 A.2d at 887–89 (Court of Chancery's consideration of issue of breach of implied covenant of good faith and fair dealing).

S.W.2d at 664. Even if an instruction about what the parties did or did not "anticipate" was a proper statement of the law, it was a "shade or variation" of the controlling issue that could have confused the jury in its effort to answer an already complex question. *See Holmes*, 62 S.W.3d at 332–33; *Johnson*, 821 S.W.2d at 427; *Ganesan*, 96 S.W.3d at 351. Because the trial court properly submitted the controlling issue to the jury, it did not err by refusing HERA's additional instruction. *See Thota*, 366 S.W.3d at 687. We overrule HERA's first and second issues.

## B.     Damages

HERA's third, fourth, and fifth issues challenge the $2.6 million damage award to Daugherty in the trial court's judgment. HERA contends (1) there is no evidence that any damages were caused to Daugherty by HERA's adoption of Section 12.1 of the Second Amended HERA Agreement; (2) the measure of damages submitted in the jury charge, "[f]air market value of Daugherty's HERA Units," was incorrect; and (3) in the alternative, the judgment awards Daugherty a double recovery.

Daugherty offered expert testimony on the fair market value of his interest in HERA on various dates. HERA concedes that the jury's answer of $2.6 million was within the range of values supported by the expert's testimony, but argues that the "fair market value" of Daugherty's units is not the proper measure of damages for two reasons. First, HERA contends that under Delaware law, Daugherty is entitled to recover only the amount by which the value of his units diminished as a result of HERA's adoption of Section 12.1. HERA contends there was no evidence that Section 12.1 affected the value of Daugherty's units at all; in fact, Daugherty's expert testified that the fair market value of the units continued to increase after Section 12.1 was added.

Second, HERA contends the "fair market value" of Daugherty's units cannot be the proper measure of damages because Daugherty "continues to own an interest in HERA and

assets representing his interest have been escrowed for his benefit." The trial court awarded damages to Daugherty and refused HERA's proposal to include language in the judgment that "Daugherty shall no longer have any ownership or other interest in HERA . . . ." HERA argues in the alternative that Daugherty has received a double recovery, again pointing to Daugherty's continued interest in HERA in addition to the award of damages in the judgment. HERA concludes that the judgment results in a windfall to Daugherty in violation of Delaware law.

Daugherty counters that (1) the amount of damages awarded by the jury was within the range supported by the evidence in the record; (2) under Delaware law he was entitled to recover "the fruits of his bargain," or his expectancy interest in his vested, non-forfeitable units, and the evidence established that Section 12.1 deprived him of his expectancy interest; and (3) the judgment does not permit a double recovery. He cites evidence that:

- when Highland made offers to purchase all HERA units, it valued Daugherty's interest at more than $2 million, but offered zero because it "determined that the costs, expenses and diminution of the assets (including goodwill) . . . exceeded the value" of Daugherty's units;

- the fair market value of his units at the time of the offer was $2.6 million;

- Section 12.1 was adopted only six days after Highland sent Daugherty a cease and desist letter regarding Daugherty's misuse of confidential information, and "in the wake" of Daugherty's refusal to testify untruthfully in Dondero's divorce proceedings as Dondero had urged; and

- Dondero told Daugherty's current business partner that the purpose of the HERA amendment was to "take away value that had been earned" by Daugherty.

The parties offered ample and conflicting evidence relating to Daugherty's expectancy interest, the intent and effect of Highland's zero offer for Daugherty's units, and the intent and effect of HERA's adoption of Section 12.1. The jury was the sole judge of the credibility of the witnesses and the weight to give their testimony. *City of Keller*, 168 S.W.3d at 819. On the issue of HERA's breach of the implied covenant and resulting damages, the jury resolved the

–33–

parties' factual disputes in Daugherty's favor. We assume the jury credited testimony favorable to the verdict and disbelieved testimony contrary to it. *Id*.

Reviewing the record in accordance with the applicable standards, there was evidence from which the jury could find that HERA's adoption of Section 12.1 was a violation of the implied covenant of good faith and fair dealing, resulting in the loss of the entire value of Daugherty's HERA units. There was evidence from which the jury could have found that Daugherty's expectation of receiving his non-forfeitable vested interest in HERA was reduced to zero upon HERA's adoption of Section 12.1, and that $2.6 million "would put [Daugherty] in the same position as if [HERA] had performed the contract." *See Siga Techs., Inc.*, 132 A.2d at 1130.

We also reject HERA's contention that the judgment awards Daugherty a double recovery. HERA relies on the jury's "No" answer in the "Divesting by Section 12.1" box in Question 17 and the trial court's refusal to declare in the judgment that Daugherty "shall no longer have any ownership or other interest in HERA or any proceeds or accounts arising from Daugherty's prior interest in HERA that were not distributed prior to the entry of this judgment, Daugherty having been awarded the full value of that interest in HERA as determined by the jury." The jury's "No" answer to Question 17, however, did not resolve the question of Daugherty's "ownership or other interest" in HERA. The jury was asked only whether HERA "failed to comply" with the HERA agreement, and was instructed that HERA failed to comply by amending the agreement to include Section 12.1 "if the Second Amended HERA Agreement divested Daugherty's Series A Preferred Units." The jury answered "No," that HERA did not "fail to comply with the HERA Agreement" in this manner. This finding is unchallenged and is

supported by the evidence.[17]  Because the jury answered "No" to the "Divesting by Section 12.1" portion of Question 17, it did not award any damages for any divestment in response to Question 18.

In sum, the question of ownership of the units was not resolved by the jury.  Whether HERA's conduct constituted a breach of the agreement is not the same question as whether or not Daugherty owns HERA units.  Judgment was rendered only on the jury's "Yes" answer to the "implied covenant" portion of Question 17, that HERA did breach the agreement by failing to comply with the implied covenant of good faith and fair dealing.  The judgment compensates Daugherty only once for his damages from that breach, in the amount the jury found in response to Question 18.  The trial court therefore rendered judgment in accordance with the jury's verdict.  We decide HERA's third, fourth, and fifth issues against it.

### CONCLUSION

Having overruled each party's issues, we affirm the trial court's judgment.

/Ada Brown/
_____
ADA BROWN
JUSTICE

141215F.P05

---

[17] The record reflects that Daugherty's HERA interest is in escrow, deposited by Highland after Highland purchased all other unit holders' interests in HERA, and HERA assigned its assets to Highland.  The escrow agreement was admitted into evidence, and Dondero testified that the amount in escrow was Daugherty's interest in HERA:

Q. (By Ms. Daniels) The interests of Pat Daugherty that were segregated were put into escrow at that point?

A. All the assets, the pro rata 20 percent ownership that Pat had in HERA, the 20 percent of the assets were segregated on Highland's balance sheet and then ultimately escrowed.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

PATRICK DAUGHERTY, Appellant/Cross-Appellee

No. 05-14-01215-CV          V.

HIGHLAND CAPITAL MANAGEMENT, L.P., Appellee/Cross Appellant

and

HIGHLAND EMPLOYEE RETENTION ASSETS LLC, Appellant

V.

PATRICK DAUGHERTY, Appellee

On Appeal from the 68th Judicial District Court, Dallas County, Texas
Trial Court Cause No. 12-04005.
Opinion delivered by Justice Brown; Justices Lang and Whitehill participating.


In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that each party bear its own costs of this appeal.


Judgment entered this 22nd day of August, 2016.